1  Edward W. Swanson, SBN 159859
2  ed@smllp.law
   Britt Evangelist, SBN 260457
3  britt@smllp.law
   SWANSON & McNAMARA LLP
4  300 Montgomery Street, Suite 1100
5  San Francisco, California 94104
   Telephone: (415) 477-3800
6  Facsimile: (415) 477-9010

7
   Attorneys for Defendant ARI J. LAUER
8

9

10                    UNITED STATES DISTRICT COURT

11                  EASTERN DISTRICT OF CALIFORNIA

12

13

14  UNITED STATES OF AMERICA,              Case No. 2:23-cr-0261 DAD

15                          Plaintiff      **DEFENDANT ARI LAUER'S**
                                           **FORMAL OBJECTIONS TO THE**
16                  vs.                    **PRESENTENCE REPORT**

17                                         Sent Date:        March 9, 2026
    ARI J. LAUER,                          Time:        9:30 a.m.
18                                         Courtroom: 4
                            Defendant.
19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.    Objections to the Factual Recitations ..................................................................... 1

II.   Objections to Loss Figure ..................................................................................... 2

  A.    The DC Solar Freedom Transactions.................................................................. 4

  B.    The Fund 9 Transaction ................................................................................. 6

  C.    Offsets Against Loss ..................................................................................... 7

    1.    Offset for Services Rendered ..................................................................... 8

    2.    Offset for Collateral ................................................................................. 14

    3.    Offset for Payments to Investor-Victims .................................................... 15

  D.    Loss Attributable to Carpoffs' Failure to Manufacture MSGs ........................... 15

  E.    Total Loss Figure ......................................................................................... 18

III.  Objection to Sophisticated Means Enhancement.............................................. 19

IV.   Objection to Restitution Figure........................................................................ 22

V.    Objections to Terms of Supervision ................................................................ 23

**Defendant Ari Lauer's Formal Objections to the PSR**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*Burgess v. Premier Corporation*,
  727 F.2d 826 (9th Cir.1984) ................................................................ 10

*United States v. Alphas*,
  785 F.3d 775 (1st Cir. 2015) ................................................................ 8

*United States v. Ameline*,
  409 F.3d 1073 (9th Cir. 2005) .............................................................. 4

*United States v. Berger*,
  587 F.3d 1038 (9th Cir. 2009) .............................................................. 4

*United States v. Bhikha*,
  No. 19-CR-00115-CRB-1, 2021 WL 3363293 (N.D. Cal. Aug. 3, 2021) ............................ 8, 10

*United States v. Coppola*,
  No. 23-3062, 2024 WL 4553809 (9th Cir. Oct. 22, 2024) ....................................... 25

*United States v. Evans*,
  883 F.3d 1154 (9th Cir. 2018) .............................................................. 23

*United States v. Farrace*,
  805 F. App'x 470 (9th Cir. 2020) .......................................................... 21

*United States v. Gomez*,
  804 F. App'x 720 (9th Cir. 2020) .......................................................... 23

*United States v. Harleman*,
  No. 23-10018, 2024 WL 2952545 (9th Cir. June 12, 2024) ..................................... 21

*United States v. Holmes*,
  No. 5:18-CR-00258-EJD-1, 2023 WL 149108 (N.D. Cal. Jan. 10, 2023) ..................... 4, 6, 13

*United States v. Hughes*,
  775 F. Supp. 348 (E.D. Cal. 1991) .......................................................... 3

*United States v. Hugs*,
  384 F.3d 762 (9th Cir. 2004) ............................................................... 23

*United States v. Kaplan*,
  839 F.3d 795 (9th Cir. 2016) .................................................................. 23

*United States v. Lloyd*,
  807 F.3d 1128, 1142–43 (9th Cir. 2015) .............................................. 16

*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020) .............................................................. 16

*United States v. Morgan,*
  376 F.3d 1002 (9th Cir.2004) .............................................................. 12

*United States v. Moschella*,
  727 F.3d 888 (9th Cir. 2013) .............................................................. 24

*United States v. Noble*,
  No. 24-2723, 2025 WL 1703642 (9th Cir. June 18, 2025) ...................... 21

*United States v. Scrivener*,
  189 F.3d 944 (9th Cir. 1999) .............................................................. 13

*United States v. Shaw*,
  3 F.3d 311 (9th Cir. 1993) ...................................................................... 2

*United States v. Smith*,
  No. 3:21-CR-64 JD, 2024 WL 2316237 (N.D. Ind. May 22, 2024)........... 13

*United States v. Snelling*,
  768 F.3d 509 (6th Cir. 2014) .................................................................. 8

*United States v. Stanley*,
  309 F.3d 611 (9th Cir. 2002) .............................................................. 23

*United States v. Treadwell*,
  593 F.3d 990 (9th Cir.2010) .............................................................. 16

*United States v. Van Alstyne*,
  584 F.3d 803 (9th Cir. 2009) ........................................................... 8, 15

*United States v. W. Coast Aluminum Heat Treating Co.*,
  265 F.3d 986 (9th Cir. 2001) .................................................................. 8

*United States v. Zolp*,
  479 F.3d 715 (9th Cir. 2007) .................................................................. 8

**Defendant Ari Lauer's Formal Objections to the PSR**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

*Ward v. Chavez,*
  678 F.3d 1042 (9th Cir. 2012) ................................................................... 24

## DOCKETED CASES

*Solar Eclipse Investment Fund III,et al., v. CohnReznick LLP, et al.,*
  (L.A. Sup. Crt. No. 19STCV45775) ............................................................ 9

## FEDERAL STATUTES

18 U.S.C. § 3553(a) ....................................................................................... 1

18 U.S.C. § 3664(d)(5) ................................................................................ 23

18 U.S.C. § 3664(f)(2) ................................................................................. 24

18 U.S.C. § 3664(k) ..................................................................................... 25

**Defendant Ari Lauer's Formal Objections to the PSR**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

Defendant Ari Lauer, by and through his counsel of record, hereby submits the following formal objections to the final Presentence Report in the above-referenced matter.

The draft Presentence Report was issued on December 19, 2025.  On January 2, 2026, defendant Ari Lauer served informal objections on the Probation Office and government counsel. *See* Dkt. 81 at 44-67.   On February 18, 2026, the Probation office filed its final Presentence Report ("PSR").  *See* Dkt. 81 at 1-43.  The Probation Office responded to defendant's informal objections (*id*. at 68-70), resolving a number of the defense objections, with four exceptions: (1) two objections to the factual recitations in the draft PSR; (2) reserving for the Court the defense objections to the loss amount calculated under U.S.S.G. § 2B1.1(b)(1); (3) rejecting the defense's objection to application of the sophisticated means enhancement at §2B1.1(b)(10); and (4) concluding a $790,602,243.78 restitution figure should be imposed.  *Id*.  In compliance with Local Rule 461(d), Mr. Lauer renews his objections on these matters as set forth below.[1]  He also raises objections to some of the terms of supervision proposed by the Probation Office.

## I.      OBJECTIONS TO THE FACTUAL RECITATIONS

Objection to paragraph 14: In his informal objections, Mr. Lauer objected to the first and third sentence of paragraph 14 which stated Mr. Lauer assisted the Carpoffs in applying for loans using false information.  The defense objected to this statement, as Mr. Lauer was not charged with any such conduct, and the defense was not aware of a factual basis for this statement.  Dkt. 81 at 44. The Probation Office's response stated the paragraph had been edited to remove the reference to Mr. Lauer.  *Id*. at 68.  However, that edit does not appear to have been implemented in paragraph 14 of the final PSR.  The defense requests that this oversight be corrected.

---

[1] In his informal objections provided to the Probation Office and the government, Mr. Lauer also objected to the Probation Office's proposed application of the 18 U.S.C. § 3553(a) factors.  Dkt. 81 at 62-66.  Because application of the § 3553(a) factors does not "affect the sentencing guideline, departure or adjustment in the particular action" (L.R. 461(d)), Mr. Lauer does not renew these objections here and will instead address those factors in his sentencing memorandum.

Objection to paragraph 34: In Mr. Lauer's informal objections, defense counsel requested that the draft PSR be modified to clarify that Mr. Lauer did not know that the Carpoffs had not made the generators sold to investors during the scheme, and counsel provided citations to evidence to support this requested change. *See* Dkt. 81 at 44-45, 57. In response, the Probation Office added a footnote stating that "According to defense counsel, there is no evidence Lauer knew during the scheme that DC Solar failed to make all the MSGs it sold." PSR at 11, n.7. Mr. Lauer requests that that phrase "according to defense counsel" be stricken and that the remainder of the sentence currently at footnote 7 be incorporated into paragraph 34. As discussed further below in Section II-D, Mr. Lauer's lack of knowledge in this regard supports an argument for reducing the loss figure calculated by the Probation Office.

Objection to paragraph 91: Paragraph 91 states that in 1998 Mr. Lauer and his wife moved to Los Angeles. In 1998, Mr. Lauer and his wife moved from Los Angeles to the Bay Area. The defense asks that this paragraph be corrected.

## II.     OBJECTIONS TO LOSS FIGURE

The Probation Office has calculated the loss amount as $912,000,000. PSR, ¶ 63. The defense objects to this conclusion.

As a threshold matter, the Probation Office has used "intended loss" for purpose of the Guidelines calculations. The Guidelines outline two ways in which loss can be calculated: "actual loss" and "intended loss." Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1(b)(1)(C)(ii). Intended loss "means the pecuniary harm that the defendant purposely sought to inflict[.]" *Id*. When calculating intended loss, a court must look to the defendant's subjective intent and make factual findings based on the evidence that the defendant intended to inflict a specific loss on his victim. *United States v. Shaw*, 3 F.3d 311, 312-13 (9th Cir. 1993) (defining intended loss as what "defendant intended to inflict on the victim" rather than a possible loss associated with the fraudulent activity, and as "the amount the defendant subjectively intended not to repay"). In this case, the evidence is that

Mr. Lauer subjectively intended for victims to get what they paid for – tax credits, depreciation and rental income – under the transactions with DC Solar.  The limited number of customers in this industry and DC Solar's reliance on multiple transactions with repeat customers meant that the only way for DC Solar's scheme to continue to succeed was for its victims to receive the benefits of their bargain (albeit a bargain they were induced to enter into under false pretenses). Where, as is the case here, the defendants' fortunes rise and fall with that of his victims, it cannot be said that there was an "intended" loss.  *See United States v. Hughes*, 775 F. Supp. 348, 350 (E.D. Cal. 1991) ("At the time of the offenses here, defendant did not intend for the banks to suffer any economic loss as a result of the loans. Much to the contrary, in order for the banks to incur a loss on foreclosure, it would have meant that the girlfriends or relatives of defendant or Mittelman would have to lose their homes along with the down payments they had made on the homes. That is not at all what defendant intended to happen.").  The defense submits that the intended loss figure in this case is not equivalent to the victims' investment amounts.

Regardless of whether the figure is described as "intended loss" or "actual loss," the defense understands that the loss figure derives from summing the victims' investment amounts. *See* **Ex. 1** (spreadsheet produced in discovery entitled "Investor Summary_DC Solar_12192019" and calculating the loss figure as $912,172,043.75).  The defense submits this figure overstates the loss amount for several reasons.  First, it includes transactions where the loss was not "caused" by the fraudulent conduct for which Mr. Lauer has been convicted, and as a result the loss from those transactions should not factor into the loss figure.  Second, the government's loss figure does not account for offsets to loss for money or collateral returned to the investors and the value of goods and services provided.  Finally, a portion of the government's loss figure arises from the Carpoffs' decision to cease manufacturing the mobile solar generators ("MSGs") purchased by investors – a decision Mr. Lauer did not know about, was not reasonably foreseeable to him, and did not further the criminal activity of the conspiracy that Mr. Lauer had jointly undertaken.  The total loss amount applicable to Mr. Lauer should be adjusted downward

3

to reflect this fact.  Below we discuss each of these reductions to the total loss figure.

A.      **The DC Solar Freedom Transactions**

"The Ninth Circuit applies a general loss causation principle at sentencing, 'permitting a district court to impose sentencing enhancements only for losses that 'resulted from' the defendant's fraud.'"  *United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2023 WL 149108, at *3 (N.D. Cal. Jan. 10, 2023) (*citing United States v. Berger*, 587 F.3d 1038, 1043 (9th Cir. 2009)).  The government bears the burden of proving this causation element is satisfied.  *Id*. (*citing United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005)).

Mr. Lauer has pled to conspiracy and substantive wire and bank fraud counts.  In so pleading, Mr. Lauer admitted to misleading investors about DC Solar's ability to sublease to third parties the MSGs purchased by investors and DC Solar's ability to generate revenue for the MSGs via the sublease payments, when in fact the vast majority of what was represented to investors as third-party sublease revenue was coming from payments made by other investors to purchase MSGs.  *See* Indictment, ¶¶ 25-26, 29 (discussing misrepresentations related to sublease ability and revenue); *see also* **Ex. 2** (Lauer Factual Basis, discussing misrepresentations related to subleases and sublease revenue).  Those misrepresentations were material to investors because the existence of third-party sublease revenue factored into the valuation of the MSGs, which in turn drove the amount of tax benefits available to investors.  *Id*.

However, beginning in approximately mid-2018, DC Solar began to market transactions to potential tax credit investors that did not rely on DC Solar's ability to generate rental income by subleasing the MSGs to third parties.  Instead, for the transactions named Fund 33, Fund 34, Fund 35, and Crestmark III, the investors' transactions contemplated the MSGs being used in what the company called the DC Solar Freedom program.[2]  Under the DC Solar Freedom

---

[2] These transactions did not form the factual basis of any substantive wire fraud or bank fraud counts alleged against Mr. Lauer.  DC Solar Freedom was run by Dan Briggs.  To the best of undersigned counsel's knowledge, Mr. Briggs has not been accused of any wrongdoing.  Indeed, the DC Solar Bankruptcy Trustee has referred to Mr. Briggs as an "innocent" insider and the DC

program, the MSGs would not be subleased by Distribution to third parties to generate sublease revenue but would instead be subleased to DC Solar's sister company, DC Solar Freedom. DC Solar Freedom had entered into an agreement with a branding company, ISM Connect. ISM Connect contracted to procure advertising partners who would pay to display advertisements on screens affixed to MSGs placed in areas of high foot traffic, such as college campuses. *See* **Ex. 3**, slide 2 (5/30/18 email chain and attached slide deck prepared by transaction broker, CohnReznick, explaining the DC Solar Freedom business model). Under this transaction model, DC Solar Freedom would receive a share of the advertising payments collected by ISM Connect and from that income would make sublease payments to Distribution, who would then pay the investors (via each investor's Fund). *Id* at slide 5. This transaction model did not rely on Distribution's ability to sublease MSGs to third parties for energy generation purposes. As a result, to the best of undersigned counsel's knowledge, the DC Solar Freedom transactions did not rely on representations about DC Solar's ability to sublease MSGs to third parties. Rather, because the DC Solar Freedom program had not yet generated revenue at the time of these transactions, prospective investors were provided market information and studies on advertising pricing and rates, as well information about a "proof of concept" project conducted by ISM Connect. *See* **Ex. 5** (6/11/18 email and attachments regarding information shared with Progressive for Fund 34); **Ex. 6** (6/28/18 email and attachments regarding information shared with GEICO for Fund 33). It is on the basis of this information that DC Solar Freedom investors invested, not the fraudulent misrepresentations and half-truths at issue in this case.

In sum, any losses associated with the DC Solar Freedom transactions did not "result from the defendant's" fraud and should be eliminated from the loss figure in this case. *Holmes*, 2023 WL 149108, at *3 (calculating loss figure based on transactions where government proved

---

Solar Freedom business as "DC Solar's legitimate operations." *See* **Ex. 4** at ¶ 57 (motion for settlement by DC Solar Trustee, Christina Lovato).

**Defendant Ari Lauer's Formal Objections to the PSR**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

investors reviewed or relied on fraudulent representations; declining to assume all investors invested as a result of fraud).  The loss amounts associated with these transactions are as follows:

Fund 33 (GEICO): $90,678,852.00

Fund 34 (Progressive): $60,254,767.00

Fund 35 (East West Bank): $16,505,775.00

Crestmark III: $15,000,000.00

As a result, the loss figure in this matter should be reduced by **$182,439,394.**

### B.    The Fund 9 Transaction

As noted above, it is the government's burden to show that the fraud in this case caused the losses at issue.  *See Holmes*, *supra*.  The unique circumstances of the Fund 9 transaction support the conclusion that the fraudulent misrepresentations regarding sublease revenue did not cause the losses experienced by the Fund 9 investor.[3]

The DC Solar equity and sales leaseback funds were structured such that Distribution would execute a master lease with the fund, and Distribution would then execute subleases with the end users of the MSGs and remit master lease payments to the fund from the sublease payments collected.  However, for reasons specific to the investor in Fund 9, an entity called GAF or SolWind, Fund 9 executed leases directly with the end users of the MSGs instead of executing a master lease with Distribution.  Fund 9 executed leases with large equipment rental entities called Ahern Rentals and KMH Rentals.  *See* **Ex. 7** (MOI of M. Guenin, KMH's owner). Ahern Rentals and KMH Rentals in turn were obligated to attempt to rent out the MSGs to its customers.  However, Ahern Rentals and KMH Rentals also executed subleases with Carpoff-controlled entities – DC Solar Solutions and Efficient Energy – and Carpoff guaranteed that he would cover any shortfall in payments to Fund 9 resulting from Ahern's or KMH's inability to rent the MSGs to their customers.  **Ex. 7**, ¶ 6, 7 (MOI of M. Guenin); **Ex. 8** at 2 (302 of G.

---

[3] The Fund 9 transaction does not form the factual basis of any of the substantive wire fraud or bank fraud counts alleged against and pled to by Mr. Lauer.

1    Barnum, counsel for Ahern Rentals).  Carpoff did indeed end up covering the payments from

2    Ahern and KMH to Fund 9.

3            While the details of the transaction are complex, the import of the arrangement is simple.

4    The memoranda of interviews and other discovery documents show that representatives of

5    SolWind knew how their transaction was actually structured.  For example, the memorandum of

6    an interview with KMH's owner Michael Guenin reports that SolWind knew from the time the

7    contracts were executed that the payments SolWind received from KMH came from DC Solar.

8    **Ex. 7**, ¶¶ 7, 14, 35.  Similarly, the 302 of the interview of Gary Barnum, Ahern's counsel in the

9    SolWind transaction, reflects that Barnum disclosed Carpoff's guarantee of the leasing

10   arrangements to SolWind's counsel.  **Ex. 8** at 3-4; *see also* **Ex. 9** (8/19/14 email chain and

11   attachments initiating lease negotiations between Ahern's and SolWind's counsel).  Likewise,

12   co-conspirator and cooperating witness Rob Karmann told investigators that he recalled being on

13   phone calls with SolWind's principals when they discussed the fact that Carpoff was making

14   payments to Ahern and KMH so that those entities could make their lease payments to SolWind.

15   **Ex. 10** at 6.

16

17           As demonstrated by these documents, the investor in Fund 9 was aware that Carpoff, not

18   third-party sublessees, funded the lease payments made to the Fund.  Thus representations made

19   to other investors that fraudulently claimed that the rental revenue came from third-party

20   subleasing – the gravamen of the offense Mr. Lauer committed - were not at play in the loss

21   experienced by the Fund 9 investor. The **$35,940,000** investment amount associated with this

22   transaction should be deducted from the total loss figure.

23       **C.    Offsets Against Loss**

24           Under the loss Guidelines, courts "need only make a reasonable estimate of the loss[.]"  §

25   2B1.1 cmt., n. 3(B).  The Ninth Circuit recognizes that the Guidelines "do not present a single

26   universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive

27   and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir.

28

7

2007). The district court's obligation is to "adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented." *United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001). "Crucially, in calculating loss, courts cannot ignore economic benefits that the defendant provided to the victim. Accordingly, to arrive at a final loss calculation, the pecuniary harm must be 'reduced by ... the fair market value of the ... services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.'" *United States v. Bhikha*, No. 19-CR-00115-CRB-1, 2021 WL 3363293, at *2–3 (N.D. Cal. Aug. 3, 2021) (quoting § 2B1.1 cmt., n. 3(D)(i)). After all, a "loss computation should distinguish between an outright swindler who peddles, say, a forged title to a bridge in Brooklyn and a fraudster who contrives to render some value (albeit less than promised) to the victim." *United States v. Alphas*, 785 F.3d 775, 781 (1st Cir. 2015). In addition, the Guidelines provide that any loss amount should be reduced by the value of any "collateral pledged or otherwise provided by the defendant[.]" § 2B1.1 cmt., n. 3(D)(ii). Finally, while the Guidelines prohibit reducing a defendant's loss amount "by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment," § 2B1.1, cmt., n. 3(E)(iv), courts have reduced loss amounts by the amount of funds returned to the investor during the scheme that were not in excess of the principal. *See United States v. Van Alstyne*, 584 F.3d 803, 817 (9th Cir. 2009); *United States v. Snelling*, 768 F.3d 509, 512–13 (6th Cir. 2014) (remanding case where district court failed to credit against loss amounts repaid that were not in excess of amounts invested).

Here, the total loss figure must be reduced to account for the fair market value of services rendered to and retained by the fraud victims, collateral pledged to (and later liquidated by) the fraud victims, and payments made to the fraud victims during the scheme. Below we explain each of these offsets in turn.

### 1. Offset for Services Rendered

DC Solar built the MSGs that underpinned some of the investor transactions. Indeed, in a

report authored by an expert hired to assist the DC Solar Bankruptcy Trustee, the expert concluded that DC Solar incurred over $500 million in legitimate expenses for the business, including $314 million spent on manufacturing MSGs.  **Ex. 11**, ¶ 72.  A number of the transactions were therefore supported by MSGs, although the MSGs were not worth the full $150,000 sales price that the investors' tax benefits derived from.  As a result, some of the tax benefits claimed by investors during the scheme remain legitimate today.  In a related civil action, several of the investor-victims produced charts itemizing the tax credits and deductions claimed as a result of their investments and disclosing the amounts they had repaid to the IRS as of that date.  *See Solar Eclipse Investment Fund III,et al., v. CohnReznick LLP, et al.*, (L.A. Sup. Crt. No. 19STCV45775); *see also* **Ex. 12** (collection of itemized damages charts).  These charts state that as of Spring 2023, over four years after the FBI raid on DC Solar and the public disclosure of the fraud, several victim-investors had retained some of the tax benefits they received.  The following investor-victims produced these charts:

(1) ADHI/Armstrong Development;[4]

(2) Dudley Ventures – Valley National Bank;

(3) East West Bank;

(4) GEICO Corp.;

(5) Dudley Ventures – Pardee;

(6) Progressive Casualty Insurance Co.

(7) Sherwin Williams;

(8) United Bank;

As an example, according to the chart produced by East West Bank (*see* **Ex. 12** at 933), that entity entered into four transactions with DC Solar, paid DC Solar approximately $56 million to purchase the MSGs, claimed nearly $100 million in tax credits and accelerated

---

[4] This investor-victim provided damages information for only one of its investments – Fund 27.

**Defendant Ari Lauer's Formal Objections to the PSR**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

depreciation, and repaid approximately $24 million to the IRS.[5]

Defense counsel submits that the amount of tax credits and deductions retained by the victim-investors represent the "economic benefits that [DC Solar] provided" to the victim-investors and that in order "to arrive at a final loss calculation," the victims' loss figures must be reduced by the value of the tax benefits retained. *Bhikha*, 2021 WL 3363293, at *2–3.[6]

In these transactions, the investor-victims received two types of tax benefits: tax credits and accelerated depreciation. A tax credit can be deducted on a dollar-for-dollar basis from the total amount of income tax a taxpayer owes. *See* **Ex. 13**, ¶ 2 (defense expert declaration defining tax credit); **Ex. 14**, ¶ 5 (declaration of SA Phillips).[7] For example, if a company has a tax bill of $5 million dollars for the year and receives $3 million dollars in tax credits, its tax bill will be

---

[5] Other investors disclosed that at the time they completed the charts, they continued to negotiate or work with the IRS to determine if additional repayment of tax credits and deductions taken would be made. *See*, *e.g.*, **Ex. 12** at 3 (chart for DV-VNB investor).

[6] Defense counsel is aware that in the civil context the Ninth Circuit has declined to offset a plaintiff-victim's damages award by the amount of tax benefits the plaintiff-victim received through a fraudulent tax shelter. *See Burgess v. Premier Corporation*, 727 F.2d 826 (9th Cir.1984). In *Burgess*, the Ninth Circuit affirmed the trial court's order disallowing an offset to plaintiffs' damages figure for tax benefits received by the plaintiffs, because, the Court reasoned, once defendants paid plaintiffs the full damages figure, the IRS would demand and the plaintiffs would re-pay the full value of the tax benefits the plaintiff-victim received. *Id.* at 838. *Burgess* has not been applied in the context of calculating loss under the Guidelines, and it should not be in this case. The *Burgess* court's assumptions that the IRS would require full repayment and that the victims would make full repayment of tax benefits do not hold in this case. The victim-investors' damages charts show they engaged with the IRS on the issue of repayment, and the IRS had not required, and the victim-investors had not made, full repayment of the tax benefits they received over 4 years after the discovery of the fraud at DC Solar. The lack of full repayment by some of the victim-investors, despite engaging with the IRS on the issue and the amount of time that passed, is evidence that they were entitled to retain some portion of the tax benefits they originally claimed. This distinguishes the loss situation in this case for Guidelines purposes from the civil damages calculation before the court *Burgess*.

[7] It is undisputed that the primary benefit or service sought by the investor-victims through their investments with DC Solar were the tax credits and accelerated depreciation, not the ownership of the MSGs. **Ex. 14**, ¶ 13; **Ex. 13**, ¶¶ 13-15, 18.

---

reduced to $2 million. Therefore, an investor's loss amount should be offset by tax credits retained by that investor on a dollar-for-dollar basis. Accelerated depreciation, the other tax benefit that investors received, is a tax deduction in which the taxpayer deducts or writes-off expenses associated with an asset in a front-loaded manner instead of over the lifetime of the asset. **Ex. 13**, ¶ 7. The benefit to the taxpayer from the accelerated depreciation is not dollar-for-dollar; instead, the benefit to the taxpayer depends on the tax rate of that taxpayer. To account for this, litigants in the civil case calculated the tax benefit flowing to the victim-investors from these this accelerated depreciation as the "deduction-related tax impact" of the investments and produced a chart itemizing the depreciation tax benefits adjusted to account for the applicable corporate tax rate. *See* **Ex. 15**, at column F. Defense counsel submits that an investor's loss amount should also be offset by the "deduction-related tax impact" benefit each investor retained after negotiations with the IRS.

In **Exhibit 16** defense counsel has consolidated the information provided in the victim-investor damages charts at **Exhibit 12** and the "deduction-related tax impact" figures in **Exhibit 15**. Defense counsel then used the following formula to estimate the net loss suffered by each victim is as follows:

Total Net Loss to Victim = [amount of investment made by victim] – [amount of tax credits taken by victim] – [the "deduction-related tax impact" of the depreciation deductions taken by victim] + [any amounts repaid to the IRS by victim]

Applying this formula to the loss figures for the victim-investors who produced damages charts in the civil litigation results in a total offset of **$131,392,563** to the losses as follows[8]:

---

[8] The total loss figures reflected in this chart for GEICO, Progressive, and East West Bank do not include losses associated with Funds 33, 34 and 35. As discussed above, defense counsel submits that the losses associated with those funds were not caused by the fraud at issue in this case and should be eliminated from the final loss figure. In addition, where an investor-victim retained tax-related benefits that exceeded their initial investment amount, the loss figure is assumed to be $0. Finally, in some instances the available data indicates that the investor-victim repaid the IRS an amount in excess of the tax benefits they initially claimed. The excess amounts appear to be interest paid to the IRS. *See* **Ex. 12** (charts itemizing "Tax Credits,

| Investor | Investment Amount | Loss Figure After Tax-Related Offsets |
|---|---|---|
| Armstrong Development | $25,780,500.00 | $25,780,500.00 |
| Dudley Ventures  (VNB) | $28,968,193.00 | $0.00 |
| Dudley Ventures (Pardee Solar) | $7,072,313.00 | $0.00 |
| East West Bank | $40,137,767.00 | $0.00 |
| GEICO | $251,395,650.00 | $251,395, 650.00 |
| Progressive | $90,427,591.00 | $90,427,591.00 |
| Sherwin Williams | $56,133,037.00 | $0.00 |
| United Bank | $28,841,670.75 | $16,822,913 |

$528,151,721.75          $396,759,159.00

**TOTAL OFFSET:  $131,392,563 (total investment amounts – total loss figures after tax-related offsets)**

In addition, defense counsel submits that there should be no loss associated with investment made by the Hays Group, the investment referred to as "Fund" in **Exhibit 1**. Discovery produced by the government shows that the Hays Group investment was audited by the IRS, and during that audit the IRS proposed adjusting the tax credits and other benefits taken by the Hays Group.  According to the 302 of interview with Hays Group accountant Gary Hecimovich, however, the Hays Group settled its audit with the IRS "in a manner that was favorable to Hays." *See* **Ex. 17** at 8.   As a result, defense counsel submits that the loss associated with this investment should be considered $0, reducing the total loss figure by **$8,754,408**.

As noted above, not all the victims of DC Solar's fraud produced damages charts in the related civil litigation.  As a result, defense counsel does not have information regarding the amount of tax benefits retained for the balance of DC Solar's victims.  The Court, however, is

Deductions, & Interest Repaid to IRS").  For Guidelines purposes, however, loss amounts cannot include "interest of any kind." § 2B1.1, cmt. 3(C)(i); *see also United States v. Morgan,* 376 F.3d 1002, 1014 (9th Cir.2004).  In calculating the loss for those investors who repaid the IRS more than the tax benefits claimed, defense counsel assumed an offset of 0% and a total loss of 100%.

only obligated to make a "reasonable estimate" of the financial loss based upon the available evidence. *Holmes*, 2023 WL 149108, at *5 ("The Court, however, is not 'obligated to search for the perfect theoretical or statistical fit' but need only adopt a reasonable, realistic, economic, projection of loss based on evidence presented.") (citation omitted); *see also* § 2B1.1 cmt., n. 3(B). Courts often estimate loss across a population of victims by extrapolating average loss figures from a sample of the victim population. *See* § 2B1.1, cmt., n. 3(B)(iv) (court may estimate loss based on "[t]he approximate number of victims multiplied by the average loss to each victim"); *United States v. Scrivener*, 189 F.3d 944, 949-50 (9th Cir. 1999) (approving of district court's method of calculating loss in telemarketing scheme where district court determined the average victim's loss among 13% of the victims and then multiplied that average loss by the total number of victims); *United States v. Smith*, No. 3:21-CR-64 JD, 2024 WL 2316237, at *3–4 (N.D. Ind. May 22, 2024) (rejecting government's contention that all fraudulently induced payments to defendant should be counted as loss where witnesses testified some legitimate work was performed and adopting alternative loss approach that assigned as loss a percentage of the full payments made). Defense counsel, therefore, proposes that the Court estimate the net loss figure for the victim-investors who did not produce damages chart by reference to the average offset to loss experienced by the victim-investors who did produce damages charts in the civil litigation. Counsel estimates that on average the loss figures for the victim-investors who produced damages charts were reduced by 55.68% due to retained tax-related benefits. Put another way, the loss figures for victim-investors who produced damages charts were on average 44.32% of their initial investment. This is illustrated in the table below:

| Investor | Total Investment Amount | Loss Figure After Tax-Related Offsets | Loss After Tax-Related Offsets as % of Investment |
|---|---|---|---|
| Armstrong Development | $25,780,500.00 | $25,780,500.00 | 100% |
| Dudley Ventures  (VNB) | $28,163,193.00 | $0.00 | 0% |
| Dudley Ventures (Pardee | $8,136,280.00 | $0.00 | 0% |

| Solar) | | | |
|---|---|---|---|
| East West Bank | $40,137,767.00 | $4,882,742.00 | 0% |
| GEICO | $251,395,650.00 | $251,395,650.00 | 100% |
| Progressive | $90,427,591.00 | $90,427,591.00 | 100% |
| Sherwin Williams | $56,133,037.00 | $0.00 | 0% |
| United Bank | $28,841,670.75 | $15,729,746.75 | 54.55% |

**Average loss after tax-related offset as % of investment: 44.32%**

Recalculating the remaining investor-victims' loss amounts to 44.32% of their initial investments results in a total offset of **$76,105,959** and the following net loss amounts for those victims:

| **Investor** | **Investment Amount** | **Loss Figure After Average Tax-Related Offset (44.32% of Investment Amount)** |
|---|---|---|
| Crestmark - 1 | $5,100,000.00 | $2,260,320.00 |
| Crestmark - 2 | $6,300,000.00 | $2,792,160.00 |
| Crestmark - 3 (DCS International) | $15,000,000.00 | $6,648,000.00 |
| FEI Investors | $1,296,000.00 | $574,387.20 |
| Firstar Development | $13,365,000.00 | $5,923,368.00 |
| Midwest REA TCF | $4,923,553.00 | $2,182,118.69 |
| Somay Holdings | $700,000.00 | $310,240.00 |
| Suntrust | $75,000,000.00 | $33,240,000.00 |
| Whitney | $15,000,000.00 | $6,648,000.00 |

$136,684,553.00        $60,578,593.89

**TOTAL OFFSET: $76,105,959 (total investment amounts – total loss figures after tax-related offsets)**

2.    Offset for Collateral

The available evidence shows that the Carpoffs provided $806,400 of collateral in the form of a Certificate of Deposit to Crestmark Bank in connection with the Crestmark II transaction. *See* **Ex. 18** (12/26/17 email and attachment showing the Carpoffs provided the CD as security for Crestmark's investment); *see* **Ex. 19** (302 of Crestmark employee confirming existence of CD). As a result, the loss figure should be reduced by **$806,400**. *See* § 2B1.1 cmt.,

14

n. 3(D)(ii).

In addition, according to the Bankruptcy Trustee's expert report, the Trustee sold approximately 6,000 MSGs built by DC Solar for approximately **$27 million**.  *See* **Ex. 11**, ¶ 70-71; *see also* **Ex. 12** (investor-victim damages charts disclosing proceeds of MSG sales recouped).   The total loss figure should be reduced by the proceeds received by the investors.  § 2B1.1 cmt., n. 3(D)(ii).

### 3.    Offset for Payments to Investor-Victims

According to the Bankruptcy Trustee's expert report, the investor-victims received approximately **$58 million** in distribution payments from DC Solar during the fraudulent scheme.  *See* **Ex. 11**, ¶ 55 (fund investors received approximately $28 million in payments; sales leaseback investors received approximately $30 million in payments); *see also* **Ex. 12** (investor-damages charts disclosing distributions received).   The loss figure should be reduced by the amount of these payments.  *See Van Alstyne*, 584 F.3d at 817.

### D.    Loss Attributable to Carpoffs' Failure to Manufacture MSGs

After the raid of DC Solar, a group of investor-victims commissioned an audit to locate and inventory the MSGs belonging to each fund or sale leaseback investor.  *United States v. Bayliss*, No. 19-cr-182, Dkt. 13 at A-6 (plea agreement).  This audit located approximately 6,000 of the 17,000 MSGs purchased by investors.  *Id*.  The audit failed to locate many of the MSGs purchased by the later-in-time investors, such as those purchased by Fund 29, Fund 30, and Fund 33.  *Id*.  The failure to manufacture some of the MSGs purchased by investors increased investors' losses above what they would have been had DC Solar manufactured all the MSGs.  In investment tax credit transactions such as these, the size of the investors' tax benefits depends upon the valuation of the renewable energy asset purchased – here the MSGs.  *See* **Ex. 13** (Lauer expert declaration explaining ITC transactions).  As discussed above, despite the fraud in this case it appears some investors retained a portion of the tax benefits that flowed to them from the DC Solar transactions.  This was presumably because the MSGs they purchased had some

15

value, albeit a value less than what the investors understood when they made the purchase. Failing to manufacture some of the MSGs, however, ensured a total loss for the transactions tied to those MSGs. The increased losses resulting from the failure to make some MSGs should not be attributed to Mr. Lauer under the relevant conduct Guidelines.

Under the relevant conduct Guideline, "a district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir.2010) *overturned on other grounds by United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020). Instead, a "defendant is accountable for the conduct of others that was both: '(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity.'" *United States v. Lloyd*, 807 F.3d 1128, 1142–43 (9th Cir. 2015). Thus, "[t]he accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity." § 1B1.3, cmt. n. 3(B). To determine "the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)" the court "may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.*

According to Jeff Carpoff, the decision not to build MSGs was "my dirty little secret" that he successfully concealed from others because the "units were built in 3-4 separate locations," so unless he told others, "nobody knew that the true count [of MSGs] was." **Ex. 20** at 7 (J Carpoff 302). The other individuals with knowledge either never told Mr. Lauer or confirmed that Mr. Lauer did not know of the manufacturing shortfall. *See* **Ex. 21**, ¶ 24 (P Carpoff MOI); **Ex. 22**, ¶ 126 (J Bayliss MOI). The discovery produced by the government shows that few of those working on behalf of DC Solar knew of the Carpoffs' decision not to manufacture all the MSGs. The individuals who did know concealed this information from Mr.

Lauer.  Because Carpoff decided not to build some of the MSGs and then to keep that "dirty little secret" from Mr. Lauer, Mr. Lauer did not explicitly or implicitly agree to this conduct, and thus the conduct does not fall within the scope of the criminal activity Mr. Lauer agreed to jointly undertake.

Nor was this conduct foreseeable to Mr. Lauer.  Indeed, throughout the term of the conspiracy Carpoff told Mr. Lauer that DC Solar built and an engineer "commissioned" (*i.e.*, inspected and certified as being in working order) all of the MSGs sold to investors.  *See* **Ex. 23** (Carpoff-Lauer text messages between 10/16/15 and 10/10/18; Carpoff representing to Lauer that commissioning of units is taking place); *see also* **Ex. 24** (Carpoff-Lauer-Roach text messages regarding MSGs being commissioned and units being built).

Finally, Carpoff's failure to make the MSGs did not further the particular criminal activity that Mr. Lauer had jointly undertaken.  The fraudulent scheme in which Mr. Lauer took part relied on DC Solar making misrepresentations to investors to induce their investment, not on DC Solar failing to build the MSGs once the investment was made.  Nor did the continued operation of the scheme depend upon the Carpoffs' decision to stop manufacturing MSGs.  Due to the low cost of manufacturing the MSGs (appx. $15,000 to $30,000, depending upon the estimate) and the inflated prices at which they were sold to investors ($150,000), the Carpoffs did not need to suspend manufacturing to keep DC Solar in operation.  The delta between the cost of manufacturing and the sales price provided ample funds to fuel the operation.  Rather, it appears Carpoff stopped making MSGs so that he and his wife could pilfer even larger sums of money from the business to benefit themselves, not to further the criminal enterprise.  *See* **Ex. 11, ¶¶ 74-76** (finding DC Solar paid the Carpoffs $85.8 million, paid another $22 million to the IRS on behalf of the Carpoffs, spent $20 million on private jets for the Carpoffs, and paid another $40 million to Carpoff-controlled entities).  The Carpoffs increased investor losses in this case by (unbeknownst to Mr. Lauer) not manufacturing all the MSGs they sold to investors so that they could further enrich themselves, not so that they could further the scheme in which

17

Mr. Lauer was involved.

Neither Mr. Lauer's conduct nor the relevant conduct of his co-conspirators caused the losses arising from the failure to manufacture the MSGs. The total loss figure should be reduced to account for the losses attributable to the failure to manufacture the MSGs. *See United States v. Hicks*, 217 F.3d 1038, 1048-49 (9th Cir. 2000) ("[L]osses caused by the intervening, independent, and unforeseeable criminal misconduct of a third party do not 'result[ ] from' the defendant's crime and may not be considered."). Per the audit conducted by the investor-victims, it appears Carpoff's conduct in failing to manufacture the MSGs was concentrated in the Fund 29, Fund 30, and Fund 33 transactions. Defense counsel submits that the loss figures associated with these transactions should be reduced to reflect the fact that the total loss figures stem from conduct for which Mr. Lauer is not accountable under the Guidelines. Defense counsel proposes reducing the loss figures for Fund 29 and Fund 30[9] by 55.68%, the average reduction in loss experienced by investors who retained tax benefits associated with the MSGs purchased. The chart below shows the calculated reduction in loss for these funds and results in total reduction of **$71,272,334**.

| Fund | Investor | Total Investment Amount | Loss Figure After Average Tax-Related Offset |
|------|----------|-------------------------|----------------------------------------------|
| Fund 29 | GEICO | $100,558,260.00 | $55,990,839 |
| Fund 30 | Progressive Insurance | $60,254,767.00 | $33,549,854 |

E.    **Total Loss Figure**

Based on the above arguments, the defense calculates the total loss figure in this matter as follows:

---

[9] Per the discussion above, the loss associated with Fund 33 has been eliminated on the basis that the transactions involved the DC Solar Freedom program.

Gross loss figure: **$912,172,043.75**[10]

- **$182,439,394** (reduction to remove DC Solar Freedom transactions)

- **$35,940,000** (reduction to remove the Fund 9/SolWind/GAF transaction)

- **$8,754,408** (offset for services rendered – tax credit and deductions retained by Hays Group)

- **$207,498,522** (offset for services rendered – tax credit and deductions retained)

- **$27,806,400** (offset for collateral value retained/provided to investor-victims)

- **$58,000,000** (offset for payments made to investor-victims during the scheme)

- **$71,272,334** (reduction to account for loss attributable to failure to make MSGs)

These reductions result in a Total Loss Figure of **$320,460,985.75** and a **+28** enhancement for loss.

## III.    OBJECTION TO SOPHISTICATED MEANS ENHANCEMENT

The Probation Office has recommended that Mr. Lauer's offense level be enhanced by 2 points due to the use of "sophisticated means" during the offense. PSR, ¶ 65. The defense objects to this enhancement on multiple grounds.

The Probation Office's support for applying this enhancement rests, at least in part, on the fraudulent conduct of Mr. Lauer's co-conspirators. PSR, ¶ 65 (stating the offense involved "multiple fraudulent acts" and explaining "the fraudulent activity was set up in such a way that it was difficult to detect as multiple coconspirators were involved and each played a distortive role.") The defense recognizes that other defendants in the related cases agreed to a sophisticated means enhancement. *See United States v. Roach*, No. 19-cr-12, Dkt. 15 (plea agreement); *United States v. Robert Karmann*, No. 19-cr-222, Dkt. 15 (plea agreement); *United States v. Jeff Carpoff*, No. 20-cr-17, Dkt. 10 (plea agreement); *United States v. Paulette Carpoff*,

---

[10] The government calculated that the sales leaseback investors' loss figure as $118,396,000. The Bankruptcy Trustee's expert concluded these investors lost $15 million less, $103,677,648. Defense counsel does not have sufficient information to determine the reason for the discrepancy but submits if that discrepancy remains unresolved by the time of sentencing, it should be resolved in Mr. Lauer's favor.

No. 20-cr-18, Dkt. 10 (plea agreement).  However, when assessing whether the sophisticated means enhancement applies, one must look to only the intentional conduct by the defendant at issue, not acts by other conspirators in the scheme. *See* U.S.S.G. Supp. App. C, Amdt. 792 (Reason For Amendment) (explaining that application of this enhancement should be based "on the defendant's own intentional conduct").  The sophisticated means enhancement cannot be based on the conduct of Mr. Lauer's co-conspirators or the overall sophistication of the scheme.  Rather, Mr. Lauer's conduct standing alone must justify the enhancement.  It does not.

Second, the defendant-specific conduct must be "especially complex or intricate offense conduct pertaining to the execution or concealment of an offense."  § 2B1.1, cmt. n. 9(B).  Mr. Lauer's entire role in the offense involved his employment as DC Solar's outside counsel and thus his work as an attorney for DC Solar.  As the PSR states, Mr. Lauer drafted legal documents, some of which – e.g., the Re-Rent Agreement and the Ahern sublease agreements – were directly used to facilitate the offense.  PSR, ¶ 65 ("The defendant created multiple interlocking documents to support lease agreements and re-rent agreements that he gave to investor companies.").  Nothing Mr. Lauer did was "especially complex or intricate offense conduct."  The transactions themselves – complex and sophisticated tax credit transactions – were sophisticated and complex in structure and papered with multiple, legal documents.  This would have been so even had no fraud been involved, and other lawyers – not Mr. Lauer – created the complex structure of the transactions and provide the intricate tax opinions that made the transactions possible.  By contrast, none of the false or misleading documents Mr. Lauer drafted were "especially complex or intricate."  The Re-Rent Agreement, for example, is a 5-page document adopted from a form or standard agreement used in the equipment industry.  It contains false assertions about DC Solar's business and a false date of execution, but none of its content is complex or intricate.  *Compare* **Ex. 25** (false re-rent agreement) with **Ex. 26** (legitimate re-rent agreement with third party).  The other fraudulent or misleading lease agreements were similarly adopted from standard documents and the "interlocking" nature of the

20

1    documents consisted of merely drafting two agreements, only one of which was provided to

2    investors. *See, e.g.,* **Ex. 27** (Count 6 conduct; Carpoff requesting Lauer draft sublease to Ahern

3    to be given to investor and a leaseback to Solutions that would not be disclosed).

4        Third, imposing both the sophisticated means and special skills enhancement would be

5    impermissible double-counting under the facts of this case. Under Ninth Circuit precedent,

6    "[d]ouble counting is generally impermissible when 'one part of the Guidelines is applied to

7    increase a defendant's punishment on account of a kind of harm that has already been fully

8    accounted for by the application of another part of the Guidelines.'" *United States v. Noble*, No.

9    24-2723, 2025 WL 1703642, at *2 (9th Cir. June 18, 2025). The Ninth Circuit has permitted the

10   imposition of both a special skills and a sophisticated means enhancements where different

11   aspects of the defendant's offense conduct warranted employing each enhancement. *See United*

12   *States v. Farrace*, 805 F. App'x 470, 475 (9th Cir. 2020) ("district court's imposition of both the

13   sophisticated means and abuse of trust or special skill enhancements did not constitute improper

14   double-counting . . . because '[e]ach of these enhancements accounted for a different aspect of

15   [Farrace's] offense . . . The sophisticated means enhancement accounted for Farrace's utilization

16   of Dignitas, a shell company, to obscure the fact that he was selling his homes to himself. . . .

17   [T]he abuse of trust or special skills enhancement was imposed based on Farrace's utilization of

18   his skills as a real estate lawyer and former broker to conduct the fraud and navigate the

19   fraudulent real estate transactions."); *United States v. Harleman*, No. 23-10018, 2024 WL

20   2952545, at *1 (9th Cir. June 12, 2024) (no double-counting where sophisticated means imposed

21   based on conduct of offense; abuse of trust enhancement imposed because client's victims

22   "entrusted [him] with a position that allowed him unique access to each victim's finances").

23   Here, the offense conduct that supports a special skill enhancement is identical to the offense

24   conduct that is the justification of the sophisticated means enhancement and results in double

25   counting because Mr. Lauer performed all of his offense conduct in his role as DC Solar's

26   attorney.

27

28

**Defendant Ari Lauer's Formal Objections to the PSR**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

1

2     The Probation Office responds that there is no double counting because in terms of the

3  sophisticated means enhancement, one "need not be an attorney" to create "fictitious interlocking

4  documents, (dkt. 81 at 69), while for the special skills enhancement, Mr. Lauer "used his legal

5  training as an attorney to assist the Carpoffs in deceiving financial investors and attempts to

6  silence whistleblowers[.]" PSR, ¶ 69. But the fact that one need not be an attorney to create

7  misleading documents doesn't change the fact Mr. Lauer acted in his role as DC Solar's attorney

8  and used his legal skills when doing so in this case, although it does indicate the lack of

9  sophistication required to create those documents. He similarly acted as an attorney and used his

10 legal skills when performing the conduct that Probation Office cites in support of the special

11 skills enhancement. In the context of this case, imposing both the sophisticated means and the

12 use of a special skill enhancements would punish Mr. Lauer twice for the conduct he engaged in

13 as DC Solar's attorney.

14 **IV.    OBJECTION TO RESTITUTION FIGURE**

15     The PSR states a restitution figure of $790,602,243.78. PSR, ¶¶ 51-56, 129. However,

16 as noted in the PSR (PSR, ¶ 55), the parties have had discussion about the restitution in this case

17 and anticipate that at sentencing they will propose to the Court an agreed-to process for

18 determining restitution. The parties will also be requesting that the restitution hearing be

19 continued for 90 days to allow the parties to work through that process. *Id*. Continuing the

20 restitution hearing is necessary for the parties to gather information from the victims.

21     The dissolution of DC Solar has generated a large number of civil lawsuits by the victim-

22 investors against DC Solar service providers and other third parties, the appointment of a

23 Bankruptcy Trustee by the Nevada Bankruptcy Court who has likewise entered into settlements

24 with and initiated and settled civil suits against third parties, and the appointment of a Receiver

25 in Florida state court who has initiated litigation against third parties. The Bankruptcy Trustee

26 has also been charged with locating and liquidating DC Solar assets and distributing the proceeds

27 to victims. And finally, the government seized and forfeited the Carpoffs' assets, the proceeds of

28

which may have been remitted to the victims.  The parties do not have information about whether and to what extent the victims have been compensated for their losses through these other proceedings.  Understanding what amounts the victim-investors have received from the various suits, negotiations, and other judicial processes is necessary to avoid double recovery by the victims.  *United States v. Stanley*, 309 F.3d 611, 613 (9th Cir. 2002) ("The purpose of § 3664(j)(2) is to prevent double recovery by a victim."); *United States v. Kaplan*, 839 F.3d 795, 802 (9th Cir. 2016) ("[I]t would be an abuse of discretion for a district court to issue a restitution award that makes a victim more than whole, such as by awarding a windfall.").  As such, the defense respectfully requests that restitution hearing be continued for 90 days pursuant to 18 U.S.C. § 3664(d)(5).

## V.    OBJECTIONS TO TERMS OF SUPERVISION

The defense objects to four proposed terms of supervision – Term 3, 5,6 and 8 – as impermissibly vague.  "A condition of supervised release violates due process 'if it either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " *United States v. Evans*, 883 F.3d 1154, 1160 (9th Cir. 2018) (*quoting United States v. Hugs*, 384 F.3d 762, 768 (9th Cir. 2004)).  The defense requests that each terms be modified, not eliminated.

Objection to Term 3: The defense objects to the portion of this condition that states Mr. Lauer "shall not enter, visit, or be present at those places where alcohol is the chief item of sale." The Ninth Circuit has stated that a very similar condition "does suffer from potential ambiguity or issues with enforcement" because "[f]or example, it may be difficult to determine whether alcohol is the 'main item of sale' at a restaurant with a substantial menu of both food and alcohol.  *United States v. Gomez*, 804 F. App'x 720, 722 (9th Cir. 2020) (upholding imposition of condition on plain error review).  The defense requests that the ambiguous portion of this condition be struck.

23

Objection to Term 5: The proposed condition prohibits Mr. Lauer from "dispo[ing] of or otherwise dissipate[ing] any of [his] assets" without Court approval so long as a restitution order remains unpaid. The defense anticipates that this case will result in a restitution order so large that Mr. Lauer will never be able to pay it off. The phrase "dispose of or otherwise dissipate of any of your assets" is impermissibly vague and poses unnecessary enforcement problems. It is not obvious from this language what spending by Mr. Lauer this condition permits and prohibits. All manner of everyday economic transactions – such as purchasing groceries or household items, booking a modest vacation, or purchasing a used car – could be considered "dispos[ing] of or otherwise dissipat[ing] any of [his] assets." The defense requests that this term be modified to read: You must not dispose of or otherwise dissipate any asset worth in excess of $6,000, without prior approval of the Probation Office. The modified condition, particularly in combination with proposed terms 6, 7, and 8, will provide the Probation Office with adequate oversight of Mr. Lauer's finances and ensure that he complies with his restitution obligations.

Objection to Term 6: The defense recognizes that the Ninth Circuit has held that imposing a condition such as this in a fraud case is not an abuse of discretion. *See United States v. Moschella*, 727 F.3d 888, 893–94 (9th Cir. 2013). However, the defense submits that the phrase "any anticipated or unexpected financial gain" is impermissibly vague and poses unnecessary enforcement problems because a person of "common intelligence must necessarily guess at its meaning and differ as to its application." For example, does a raise in salary constitute an anticipated financial gain that must be applied to an outstanding restitution order in perpetuity regardless of the defendant's financial condition and obligations? Here the Court will set a restitution payment schedule with reference to the defendant's financial resources and other obligations. *See* 18 U.S.C. § 3664(f)(2); *see also Ward v. Chavez*, 678 F.3d 1042, 1050 (9th Cir. 2012) (repayment schedule is required if the Court determines Defendant "has insufficient financial resources to make immediate repayment") Compliance with that restitution schedule, coupled with the condition that the windfall events of tax refunds, lottery winnings and

24

inheritances be applied to a restitution order sufficiently protects the interests of the victims.  In addition, if Mr. Lauer's financial situation materially changes such that the scheduled payments should be increased, the Court can adjust the schedule of restitution payments to reflect that change, "as the interests of justice requires."  18 U.S.C. § 3664(k).

Objection to Term 8: The defense objects to this term of supervision and requests that it be modified.  The Ninth Circuit has explained that the portion of the proposed condition that prohibits a supervisee from incurring "new credit charges" without the permission of the Probation Office "could be understood to cover making individual credit-card transactions rather than simply obtaining new credit cards."  *United States v. Coppola*, No. 23-3062, 2024 WL 4553809, at *1 (9th Cir. Oct. 22, 2024).  The Ninth Circuit has further held that such a requirement constitutes a "greater deprivation of liberty than is reasonably necessary," if it is coupled with other terms of supervision that provide sufficient oversight.  *Id*.  The defense requests that this term of supervision be modified to eliminate that clause as follows: "You must not open any new lines of credit and/or incur new debt without the prior permission of the probation officer, unless you are in compliance with the periodic payment obligations imposed pursuant to the Court's judgment and sentence."

Dated: February 23, 2026                              Respectfully submitted,


                                                      /s/ Edward W. Swanson
                                                      EDWARD W. SWANSON
                                                      BRITT EVANGELIST
                                                      SWANSON & McNAMARA LLP
                                                      Counsel for ARI LAUER