ERIC GRANT
United States Attorney
AUDREY B. HEMESATH
NICHOLAS M. FOGG
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>ARI J. LAUER,<br><br>     Defendant. | CASE NO. 2:23-CR-261 DAD<br><br>UNITED STATES'S SENTENCING MEMORADUM<br><br>Date: March 9, 2026<br>Time: 9:30am |

  Ari Lauer brought extraordinary skill as a sophisticated corporate lawyer in a sophisticated tax scheme to facilitate an extraordinary crime, the largest criminal fraud case in Eastern District of California history. As the only attorney on the inside, he should have been the first person to say that the conduct was fraud and put a stop to it. Instead, he is the last person to acknowledge guilt, only doing so on the eve of trial, and disputing the magnitude of his conduct in these sentencing proceedings.

  His conduct is deserving of a commensurately high sentence—294 months—a guidelines sentence that accounts for the high loss amount, Lauer's critical role as an attorney providing legitimacy to the scheme, and other aggravating circumstances and personal characteristics that merit such a deterrent sentence.

I.  **LAUER WAS ESSENTIAL TO THE DC SOLAR SCHEME ON EVERY LEVEL.**

  Without the participation of Lauer, the DC Solar fraud scheme would never have gotten off the ground. Lauer's co-conspirators were entrepreneurial and ambitious, but Lauer brought the necessary

professional skill as a lawyer to convert this raw appetite for profit into an elite tax scheme. All of Lauer's actions, even seemingly benign lawyerly tasks such as drafting a promissory note, were in furtherance of that scheme. As the chronology moved forward, DC Solar took increasingly fraudulent actions, for example faking documents and paying for signatures. Lauer was not directly involved in some of these obviously criminal acts, as described further below, but he was willing to accept fraudulent documents and representations from Jeff Carpoff in circumstances where the documents and representations were blatantly implausible. Lauer washed those lies through his law office and sold them to investors.

### A. Lauer was the only counsel for DC Solar.

Lauer served as DC Solar's outside counsel, as well as Jeff and Paulette Carpoff's counsel, since about 2009. There was no DC Solar in-house counsel. Lauer, and Lauer alone, was responsible for all legal work for DC Solar since 2013, which encompasses the entirety of the fraud scheme. In this role, Lauer drafted and negotiated all the legal documents that papered all of the deals in the indictment (as well as all the other deals not charged). Lauer had near-daily contact with the key players at DC Solar, including Jeff Carpoff and accountant Ron Roach.

From early on, Lauer had a complete understanding of the DC Solar business model, including the lack of third-party lease revenue at the heart of the fraud scheme. He also had intimate knowledge of the terms of each of the individual deals. Lauer had critical knowledge about the lack of available third-party lease revenue across the arc of the case.

### B. Lauer gave the imprimatur of legitimacy to the DC Solar investment model.

Lauer's participation in the scheme—from deal pitches to negotiations to sifting through the details of the deal documents—gave the gloss of a legitimate, reliable business model. While DC Solar's basic business model was the sale of mobile solar generators, it was really selling an investment opportunity and a tax opportunity. Lauer's co-conspirators Jeff and Paulette Carpoff simply did not possess the level of polish to present as a reliable corporate investment opportunity without the partnership with Lauer. One co-conspirator described Carpoff as a country bumpkin who needed people like Lauer and Roach to make things happen. Ex. 62. Another stated that Paulette did not have the cognitive capacity to lead DC Solar and described Jeff as a hillbilly. Ex. 63.

2

Investors' descriptions of Lauer ranged from being a regular attorney to a sharp attorney. He maintained outward conduct and demeanor that did not set off any red flags, even for very sophisticated counterparties.

The Carpoffs, by contrast, presented a loss polished image. Paulette was described as controlling, and Jeff was an excess spender who chased a lifestyle of race cars and displayed wealth. Paulette, who had a business degree from Heald College, explained the role Lauer played for them as making the numbers work. She was not one to deal with the sophisticated lawyers involved in these transaction; instead, it was Lauer on the DC Solar side and white collar firms on the opposite side. Ex. 65. Looking back, at least one investor recognized that Carpoff surrounded himself with an attorney and an accountant in order to validate the potential investment deal. Ex. 64.

Without Lauer's knowledge of the DC Solar business model and his gravitas in representing DC Solar in the deals, it would have been impossible for Carpoff to hold any serious conversation with investors on the scale he was targeting.

C. **Lauer brought a sophistication that impressed the investors.**

As an attorney representing DC Solar in the investment deals, Lauer was competent, reliable, and involved at the granular level. He was not just an attorney who lent his credentials or past success in furtherance of the scheme; rather, he contributed real work that in turn diminished any suspicion the investors might have.

As a transactional lawyer, Lauer possessed the skill to facilitate the investment deals. The discovery in the case has hundreds of pages of drafts of deal documents and email correspondence with transactional lawyers on the other side of the deals. Carpoff and Roach admired the finish-line pushes Lauer made to complete the deals, painting a picture of Lauer working on his own, long days and nights, negotiating these deals against law firm corporate deal teams on the other side. Lauer's efforts and ability to negotiate opposite these well-heeled corporate attorneys had the effect of cloaking any suspicion of criminality. If Lauer had not dressed up in corporate deal garb what was really new money being brought into a Ponzi scheme, there is no chance these sophisticated investors would have actually parted with their money.

Furthermore, by positioning himself as an independent lawyer—"Law Offices of Ari J. Lauer,

3

APC"—Lauer maintained a veneer of distance from the DC Solar operation itself. In reality, Lauer had a long, close relationship with the Carpoffs, handling matters for them even before they envisioned DC Solar. Lauer helped them grow from having merely the idea of mounting generators onto trailers into a sophisticated tax investment opportunity for banks and other corporate entities. Lauer's separate Walnut Creek law office helped give the impression to investors that DC Solar retained a reputable independent attorney to represent them in deals, rather than a co-schemer who stood to profit as additional money flowed into the fraud.

### D. Lauer did whatever was necessary to further the scheme.

Because Lauer was more than just a corporate deal lawyer, he also possessed the skillset and the willingness to do whatever was needed to advance the scheme. Indeed, Jeff Carpoff acknowledged as much in the lavish company holiday party, set at the Fairmont Hotel in San Francisco, where Carpoff, Lauer, and a large crowd of guests toasted the success of the scheme in 2016. Carpoff says, "Being a creative guy, you have to have good legal counsel." Carpoff continued, smiling, "Ari has been with us since day one. He created the corporation DC Solar . . . The guy is aces. Willing to work around the clock. Willing to do whatever is necessary to get the next deal done." Ex. 66.

Two years later, at another over-the-top holiday party at the Fairmont, Jeff and Paulette Carpoff, again emceeing, dressed in black tie and passing out bonus checks. Jeff says, "We all need a good attorney . . . Everybody in this room needs to thank this man. If it wasn't for Ari, we wouldn't be where we are at today." Ex. 67.

Against the backdrop of the fraud scheme, it is clear that Carpoff is not just referring to a strong work ethic, but to Lauer's willingness to adapt and advance the fraud at critical junctures where it otherwise would not have succeeded. There are several examples throughout the case where Lauer uses his position and skill as a lawyer to do whatever was necessary to avoid exposure of the fraud scheme. Rather than follow his obligation as a lawyer and member of the California Bar to avoid assisting a client in conduct in criminal or fraudulent conduct, Lauer consistently took steps to facilitate the scheme.

   1. Early DC Solar employee who uncovered the lack of Generators

The first such example came early in the scheme. Brian Caffrey was a car salesman who came

4

to DC Solar in 2011.  DC Solar had just closed a tax equity deal with Sherwin Williams, and Sherwin Williams planned to come to the DC Solar office to audit the Generators that were part of the deal.  But DC Solar had only a fraction of the Generators built.  Carpoff had Caffrey assist in arranging the existing Generators to give the illusion of being more plentiful than they were.  Ex. 57, 58.

Caffrey confronted Carpoff, told him he would end up in prison if he continued doing what he was doing, and quit.  Lauer and Carpoff arranged a severance agreement for Caffrey.  Caffrey told Lauer why he was quitting—i.e., his discovery of fraud at DC Solar.  Ex. 57, 58.

Lauer negotiated the terms of the severance package directly with Caffrey, who found Lauer to be arrogant and condescending.  Lauer accused Caffrey of trying to extort Carpoff.  Lauer gave Caffrey the impression that Lauer thought he was a criminal (for the "extortion") and a nuisance.  Caffrey found it stressful negotiating opposite Lauer, as Caffrey was not an attorney, and Lauer's demeanor was combative.  Ex. 57, 58.

Lauer's choice to not only ignore the fraud warning that Caffrey uncovered, but to actively work to intimidate Caffrey, is indicative of Lauer's culpability.  As a lawyer, Lauer especially should have quit, just as Caffrey did.  But Lauer chose a different path, at the earliest part of the scheme, and this choice carried forward across the remaining arc of the next seven years of the fraud scheme.

        2.        Backdated re-rent agreement

The next example of Lauer doing whatever it took to continue the scheme and avoid detection was in the re-rent agreement.  To justify the Ponzi-like intercompany transfers, the conspirators relied on a fake re-rent agreement executed between DC Solar Solutions and DC Solar Distributions, which purported to authorize Solutions to lease Generators from Distributions and re-rent them to its own customers.  Under the agreement, Distributions would deliver monthly invoices to Solutions, which Solutions would pay with third-party rental revenue.  Distributions would then use that "revenue" to meet its obligations to the Funds.  Although the re-rent agreement was purportedly executed in 2011, it first appeared in emails in 2014, delivered by Lauer to Roach, in the context of the IRS investigation.  Lauer drafted the re-rent agreement in 2014 and backdated it to 2011.  Ex. 69, 70.

The backdated re-rent agreement was an obvious effort to paper over the internal flow of money that would, if detected, unravel the scheme.  The re-rent agreement served no legitimate purpose, and the

additional act of backdating the document is one of marquee moments that defines Lauer's role in the fraud as willing to step across the line and use his attorney function to engage in fraud.

### 3. Second DC Solar employee who uncovered the fraud

Sebastian Jano was a DC Solar employee who joined late in the scheme. Jano discovered DC Solar's low third-party leasing revenue in the course of his work and began to poke around. Jano concluded that Distribution's third-party lease revenue was under $2 million, not $90 million. Jano also saw that the majority of Distribution's revenue came from intercompany transfers from Solutions to Distribution. He saw no business reason for these transfers, which he said looked ridiculous. Ex. 71.

Jano then contacted Lauer and told him that KeyBank had been asking about leasing revenue and that he was not seeing the lease revenue in DC Solar's documents. Lauer told Jano that he would be at the DC Solar office the next morning and that Lauer, Jano, and Jeff Carpoff could discuss the matter. Jano, Lauer, and Carpoff met at DC Solar. According to Jano, Lauer did most of the talking and tried to explain why Solutions would be sending millions of dollars to Distribution.

Jano was unconvinced, and he resigned from DC Solar through a resignation letter directing correspondence to his attorneys. In June 2018, DC Solar sent Jano a "cease and desist" letter, authored by Lauer, effectively threatening legal action against Jano if he were to discuss the lack of third-party lease revenue. Ex. 71, 61. This use of a "cease and desist" letter was an attempt to bully Jano into keeping quiet about the DC Solar fraud, dressed up in the same kind of legalese that had worked to keep Caffrey from outing the fraud back in 2011. Lauer's abuse of his role as counsel in both instances is an aggravating fact that cuts against the narrative that Lauer would portray of himself as a tempered outside transactional lawyer.

## II. AS INVESTORS REQUIRED MORE VALIDATION, LAUER SUPPLIED MORE FRAUDULENT SUPPORT

Over time, Lauer and the other members of the conspiracy were forced to improvise as investors required more and more validation of the claimed third-party lease rates. This pressure resulted in some of the most fraudulent conduct in the scheme.

### A. Utilization Rates

#### 1. Hiding the truth behind the veil of confidentiality

Lauer and the other members of the conspiracy intended investors to believe the purported revenue in the deals was generated by third-party lease agreements and not from transfers from Solutions. If asked for detail supporting Distribution's purported revenue, Lauer often took the lead in warding off the request, usually claiming the detail was confidential. Very early in the negotiation of the first fund, the investor sought documentation to prove the 80-90% utilization claimed by Carpoff, but Lauer declined, stating that the lease information was confidential. Ex. 73. The true lease rate was only 5%, as it was throughout the entire scheme. It was Lauer who used the lawyerly claim of "confidentiality" to shield this critical information from investors.

#### 2. Real-seeming data

With one investor, Lauer adapted the use of a software program to create real-seeming data. Lauer wrote to his co-conspirators, proposing to tell the bank that a certain software was used to track the third-party lease rate in the Fund. Lauer wrote, "I was hoping we could use the High Five software to create actual Fund accounts. Even if the data isn't real, the screenshots would look more real." Lauer then emailed the attorney for the bank, "See attached snapshots from High Five software and GPS…. The demand far exceeds what we can build between now and 2016. We believe that market will bear another 10,000 units based upon existing demand…." Ex. 74, 75. In truth, the existing demand for Generators by third-party subleases was very low, as Lauer knew.

#### 3. Half-truths

The real utilization rate for the Generators was only 5%, but Lauer took pains to avoid revealing that truth to investors. For one investor, Lauer dodged questions about the specifics of the third-party lease information, falsely claiming that the third-party lease information the bank was seeking was not available. On another occasion, Lauer sent a summary that omitted the information that only around 5% of the subleases were actually to third-party users, and that there was no basis to support the projection that the occupancy factor would be in the 90th percentile where demand had never previously exceeded 5%. Ex. 76.

B. **T-Mobile**

In a subsequent deal, Lauer moved beyond half-truths about utilization rates and into sponsorship of wholly fraudulent documents. Key Bank invested premised on a deal to lease the Generators to T-Mobile, with the lease revenue the basis by which Key Bank would get repaid.

The deal was premised on a fraudulent contract. Carpoff offered co-conspirators Ryan Guidry and Alan Hansen $1 million each to get a signature on a contract purporting to obligate T-Mobile to lease 1,000 Generators from DC Solar for approximately $1,100 per month each, for a period of at least 10 years. Ex. 64.

Lauer is the person responsible for passing the fraudulent T-Mobile contract on to the Bank, which included the fraudulent terms: "DC Solar will sublease the Facilities to T-Mobile for the Lease Term" and "the T-Mobile lease is in good standing with DC Solar, and there are no defaults by T-Mobile under the leasing arrangement." Ex. 1105, 1108.

Lauer then sent a second fraudulent T-Mobile document to Key Bank—a fraudulent estoppel certificate that furthered the lie, purporting to certify that T-Mobile had paid its lease obligations of $1.1 million per month for the past two years and would continue to make such payments for the next ten years.

Of course T-Mobile had not made those payment because the contract was fake. Soon after the deal closed, Key Bank became suspicious of the T-Mobile sublease. Key Bank sought repayment of its investment from DC Solar, and Lauer helped negotiate the terms of the repayment. Lauer was careful to include provisions that Key Bank would not be given documents that would reveal the truth about the lack of sublease payments from T-Mobile. Ex. 77.

C. **International Speedway Corporation**

Another example of Lauer's willingness to sponsor fraudulent documents in furtherance of the DC Solar deals came with the Crestmark and SunTrust deals premised on a supposed third-party lease agreement with International Speedway Corporation.

In the Crestmark deal, the heart of the fraud was a three-part series of contracts that all involved Lauer. The reality was that ISC did not need very many Generators. In order to incentivize them to accept Generators for sublease, DC Solar agreed to pay them for advertisements and sponsorship in an

8

amount that would exceed what they were spending on subleasing Generators. In this way, ISC would profit from subleasing Generators in excess of its actual need. This agreement between DC Solar and ISC regarding advertising and sponsorship was documented in a sponsorship agreement. The DC Solar – ISC sublease agreement did not reference the sponsorship agreement. Lauer also helped draft an addendum to the sublease that gave ISC the option to terminate the lease with DC Solar after five years or at any time should DC Solar stop its sponsorship agreement.

Lauer negotiated two deals with Crestmark, never disclosing either (1) the existence of the sponsorship agreement or (2) the existence of an addendum with a five year termination option. Ex. 78. The decision to withhold this information from Crestmark was intentional because the sponsorship agreement would raise questions about why ISC needed an additional incentive to enter into a sublease for the Generators. The existence of a five year termination option in the addendum would raise questions about whether what had been marketed to Crestmark and other investors as a ten-year sublease was really a ten-year sublease. By withholding from Crestmark the existence of the sponsorship agreement and sublease addendum, Lauer avoided scrutiny of the true value and revenue-generating ability of the Generators.

Lauer repeated the same basic fraud on SunTrust Bank. The SunTrust deal was also premised on a hidden sponsorship agreement, sublease agreement, addendum. Once again, ISC did not need the number of Generators that DC Solar sought to lease, and in order to incentivize them to accept more Generators for sublease, DC Solar agreed to spend a certain amount on advertisements and sponsorship. Lauer pushed the SunTrust sales-leaseback deal through to closing based on the false pretense that the sublease agreement represented the whole deal. Ex. 80.

### D. Ahern

Another example of Lauer affirmatively sponsoring false information came in the East West Bank deal. The deal was premised on a sublease with Ahern Rentals, but that premise was fraudulent. Lauer and Carpoff worked to create both a backdated Ahern rentals lease giving the appearance of having been signed in 2014, as well as a new re-rent agreement, this time between Ahern Rentals and Distribution, which provided that Ahern Rentals would lease Generators back to Distribution. This Ahern Rentals – Distribution re-rent agreement had no purpose other than to mask the reality that Ahern

did not need anywhere the number of Generators provided for in the Ahern Rental sublease, and did not want to be financially liable for those Generators

Lauer gave only the Ahern sublease to the bank, giving the appearance of having been signed in 2014, and of course no mention of the Ahern re-rent agreement. Ex. 608, 608A, 610, 610A.

### III. LAUER ENRICHED HIMSELF AND SAW THE POTENTIAL FOR FURTHER ENRICHMENT

The motivation for Lauer in this fraud scheme was ultimately financial. The government is not aware of any extenuating circumstances such as occasionally are found behind a willingness to engage in criminal conduct, such as pressing debt, gambling addiction, or poverty. Instead, Lauer had a solo law practice in an affluent suburb, no apparent vices, and no obvious motive to engage in fraud conduct. And yet, he continued to enable the DC Solar fraud scheme for years, enriching himself in the following ways.

#### A. Deal compensation

Lauer billed DC Solar on every deal, operating as one would expect outside counsel to operate in negotiating multimillion dollar deals. Given the brisk pace of deal completion over the years of the DC Solar fraud scheme, this work provided steady income to the Ari Lauer law firm, approximately $4.8 million.

#### B. Bonuses

The $4.8 million figure included two significant bonuses Lauer received to reward the criminal risk Lauer took to complete the deals. On the Key Bank deal, which involved the fraudulent T-Mobile lease described above, Carpoff incentivized Roach and Lauer with a $500,000 payout if they got the Key Bank deal done. At the end of the deal, he kept his word and wired them $500,000 each.

Then again on the SunTrust deal, Lauer received a $500,000 bonus from Jeff Carpoff for his role in facilitating the transaction, which was premised on the hidden International Speedway sponsorship agreement and addendum. Carpoff had once again promised Lauer this reward if he got the deal to go through, and Lauer delivered.

#### C. Possibility of eventual sale of the company

In the background of the years of hard work that Lauer and Roach put into DC Solar was their

hope that the company might one day be sold for tremendous profit. Ex. 68. It can be inferred that part of Lauer's continued motivation to further the scheme was this hope of an even greater payout someday.

## IV. LAUER HAD OPPORTUNITIES TO OFF-RAMP THE FRAUD SCHEME AND NEVER TOOK THEM.

Another aspect of Lauer's culpability is the fact that Lauer had may opportunities over the years to off-ramp the fraud scheme, but he never took them.

For example, right in the beginning of the scheme, Roach recalls a discussion in approximately June 2012, in which Lauer, Carpoff and Roach decided not to disclose to investors Distribution's failure to generate third-party lease revenue. Instead, they elected to conceal that failure. According to Roach's account, which is supported by text messages, Carpoff, Lauer, and Roach discussed DC Solar's lack of lease revenue approximately 100 or more times by phone or in person.

Lauer had the opportunity to reveal the truth about the lack of third-party lease revenue on every deal, with every meeting with a prospective investor, and in particular on two occasions where the pressure to end the scheme would have been at its peak, but Lauer instead found a way to keep the fraud going.

### A. IRS audits

Lauer, Roach, and Carpoff were all involved in defending the DC Solar entities in IRS audits of particular Funds.

In March 2017, while another audits played out, Because of the IRS audit, Roach was forced to send the Fund Zero representatives the true sublease activity and the re-rent from Solutions. Lauer was aware because Roach emailed him about it. Roach and Lauer were very concerned about the whole scheme unravelling at that point. Roach praised Lauer for his handling of one of the investors during this time: "You're welcome and thanks for the kind (and very exaggerated) words. It went well but I'm still waiting for it to hit the fan. Maybe everyone will stay on their best behavior until they see the results. You've done a great job of balancing the impossible, what's best for D.C. solar and what's best for the Fund audit defense. Well done!" Ex. 81.

These moments of high tension, which posed an existential threat to the DC Solar operation, would have been a natural opportunity for Lauer to end his participation in furthering the fraud. Lauer

had an opportunity with every deal to reveal the true third-party lease information to investors, or to simply end his representation of DC Solar. But instead, Lauer's survival of the IRS audits only seemed to embolden his conduct, as with his sponsorship of the T-Mobile lease and International Speedway deceptive sublease.

### B. Key Bank Repayment

Another natural point for Lauer to walk away from the fraud scheme would have been after Key Bank demanded repayment when the bank uncovered the problem in the third-party lease demand. Ex. 82, 83. But rather than walk away, Lauer continued to help bring in new investor money—specifically, the SunTrust Q4 deals that Lauer was negotiating right up until the execution of the search warrant, which occurred after the Key Bank deal had already fallen apart. Lauer continued to be willing to put together deal documents based on the lie that there was a demand for Generators and that DC Solar was taking in third-party lease revenue. The Key Bank bust ought to have been a major reckoning point for Lauer, as the failure resulted in DC Solar's having to repay $27 million to the bank. But Lauer persisted, and it was only with law enforcement disruption of the scheme that Lauer's fraudulent conduct was finally curbed.

### V. LAUER IS DIFFERENTLY SITUATED FROM EVERY OTHER DEFENDANT

Following the FBI and IRS's execution of a search warrant at the DC Solar facilities, every other defendant in this case quickly came to a resolution. Each of the following defendants resolved quickly via information with a cooperation agreement:

| Defendant | Role(s) | Date of Plea | Sentence |
|---|---|---|---|
| Jeff Carpoff | CEO of DC Solar<br>Owner/operator of Solutions | 01/24/2020 | 30 years |
| Paulette Carpoff | COO of DC Solar<br>Owner/operator of Distribution | 01/24/2020 | 12 years |
| Ronald J. Roach | CPA, tax consultant, and financial advisor to DC Solar | 10/22/2019 | TBD |
| Robert A. Karmann | CFO, previously Controller | 12/17/2019 | 6 years |
| Joseph W. Bayliss | DC Solar electrician posing as engineer | 10/22/2019 | 3 years |
| Ryan Guidry | Recruited Hansen to sign false T-Mobile lease used to induce investors; $1M bribe | 01/14/2020 | 6.5 years |
| Alan Hansen | Signed false T-Mobile lease used to induce investors; $1M bribe | 01/28/2020 | 8 years, reduced to time served[1] |

Lauer stands in contrast to these other defendants. Despite being aware of his exposure from the time of the search warrant, Lauer did not seek a pre-indictment resolution, did not cooperate, and did not readily accept responsibility for his conduct. Instead, he waited until trial was less than a month away to plead open. Now having pled, Lauer has resumed challenging numerous aspects of the PSR, minimizing both his role in the scheme and the scope of the scheme.

Lauer's punishment should reflect the fact that he is differently situated. While he had every right to maintain his innocence and put the government to its burden of proof at trial, having now conceded his guilt, Lauer should not receive the same benefit as the early cooperators, most of whom were significantly less culpable than Lauer and none of whom possessed the unique skillset to facilitate the transactional aspect of the fraud scheme.

Lauer may not have been the genesis of the most fraudulent conduct—e.g., burying GPS units or getting forged signatures. But his role in giving the scheme legitimacy through legal documents was at least as important as the cumulation of these individual fraud acts. He was willing to look the other way on an obvious lack of real lease revenue, and then sell the DC Solar investment as if the market demand

---

[1] The government moved for this further reduction in Hansen's sentence based on his additional cooperation and other circumstances related to the fact that he had already been transported to Sacramento to testify at Lauer's trial when Lauer pled guilty.

13

were actually there. In many of the deals, it is Lauer who saved the day by convincing investors that they need not look too hard at the source of the third-party lease revenue. In this way, he is as essential to the entire conspiracy as Carpoff himself, and he should receive a term of imprisonment proportionate to that role.

### VI.     LAUER MERITS A GUIDELINES SENTENCE

The sentencing guidelines in this case are high, but this is an extraordinary case. Lauer has not identified any basis for a variance from the sentencing guidelines.

#### A.     This case is within the mine run of billion-dollar Ponzi scheme cases.

The primary driver of the guidelines calculation in this case is the loss amount. The billion-dollar loss amount in this case is historic in the District, and Lauer's punishment should be in line with the brazenness of the scale of the fraud. The correct point of comparison is with other billion-dollar fraud schemes, and nothing about this case takes it out of the mine run of other high-dollar fraud schemes. *United States v. Treadwell*, 593 F.3d 990, 1017–18 (9th Cir. 2010).

Lauer presents with no redeeming characteristics that are not already accounted for by the Guidelines. He was not lured by a more sophisticated partner, he did not leave the conspiracy early when the fraud got to be too much for him, and he was not pressed to participate by a particularly compelling set of circumstances. It is true that he has no prior criminal history, he is not young, and he is not violent, but the sentencing guidelines already account for those characteristics and have no impact on the guidelines calculation in this case.

Because this case is within the mine run of other large scale Ponzi schemes, a guidelines sentence is appropriate. A downward variance would create an unwarranted sentencing disparity. Lauer has presented no basis for a downward variance. None of the personal qualities he may possess explains his years-long participation in a massive fraud scheme that was apparently motivated by nothing more than raw greed. And as the only lawyer in the scheme, he should be held to a higher standard, not rewarded for his white collar background.

#### B.     A mid-range sentence is appropriate under the circumstances of this case.

Within the guidelines range, the Court should select a mid-range sentence.

A low-end sentence is typically reserved for defendants who accept responsibility via a guilty

plea, or possess some mitigating quality that makes low-end consideration appropriate. Lauer waited years to plead open, on the eve of trial, under the pressure of a fully-prepared case against him. He was at the top of the scheme with Carpoff, who received the statutory maximum sentence of 30 years, despite his quick acceptance of responsibility. Thus, the government argues for a sentence at the middle of the guidelines range.

### C.     A 294-month sentence is substantively reasonable.

Finally, 294-month sentence is sufficient but not greater than necessary to effectuate the sentencing goals of 18 U.S.C. § 3553. The government acknowledges that this is a very long sentence, particularly in light of Lauer's age. But all of the factors described throughout this sentencing memorandum combine to support this impactful sentence, which will deter other lawyers from facilitating future frauds, and will provide just punishment for a years-long offense that sent several other less culpable co-conspirators to jail, caused hundreds of millions of dollars on the investors, and brought disrepute on the legal profession.

### VII.     CONCLUSION

The Court should sentence Lauer to a term of imprisonment of 294 months.

Dated: March 4, 2026                                    Respectfully submitted,

                                                        ERIC GRANT
                                                        United States Attorney

                                                By:    /s/ *AUDREY B. HEMESATH*
                                                        AUDREY B. HEMESATH
                                                        NICHOLAS M. FOGG

                                                        Assistant United States
                                                        Attorneys