Edward W. Swanson, SBN 159859
ed@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant ARI J. LAUER

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff <br><br> vs. <br><br> ARI J. LAUER, <br><br> Defendant. | Case No. 2:23-cr-0261 DAD <br><br> **DEFENDANT ARI LAUER'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE PURSUANT TO 18 U.S.C. § 3553** <br><br> Sent Date:      March 9, 2026 <br> Time:             9:30 a.m. <br> Courtroom:     4 |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.    THE PRESENTENCE REPORT.......................................................................... 1

III.    SENTENCING RECCOMENDATION .............................................................. 1

   A.    The nature of the offense and Mr. Lauer's history and characteristics justify a
         78-month sentence. ........................................................................................ 2

      1.    The nature of the offense .......................................................................... 2

      2.    The history and characteristics of Mr. Lauer ........................................... 5

   B.    The goals of sentencing can be achieved by a 78-month sentence................... 11

      1.    A 78-month sentence will reflect the seriousness of the offense, promote respect
            for the law, and provide just punishment................................................. 11

      2.    A 78-month sentence will provide adequate deterrence and protect the public from
            further crimes ........................................................................................ 13

      3.    A sentence of 78 months would take into account the lack of empirical evidence
            supporting the fraud guidelines................................................................ 16

      4.    A 78-month sentence is necessary to avoid unwarranted sentencing disparities.......... 19

IV.    CONCLUSION................................................................................................ 25

**Defendant Ari Lauer's Sentencing Memorandum**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Kimbrough v. United States,*
   552 U.S. 85 (2007)................................................................... 16

*Spears v. United States,*
   555 U.S. 261 (2009)................................................................. 17

*United States v. Adelson,*
   441 F. Supp. 506 (S.D.N.Y. 2006).................................. 10, 18

*United States v. Baker,*
   445 F.3d 987 (7th Cir. 2006) ...................................... 15

*United States v. Corsey,* 7
   23 F.3d 366 (2d Cir. 2013)................................................. 18

*United States v. Gupta,*
   904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014)...................... 18

*United States v. Lenagh,*
   No. 8:07-CR-346, 2009 WL 296999 (D. Neb. Feb. 6, 2009) ................................. 18

*United States v. Watt,*
   707 F. Supp. 2d 149 (D. Mass 2010) ......................................... 18

### **FEDERAL STATUTES**

18 U.S.C. § 3553(a) .................................................................. passim

### **OTHER AUTHORITIES**

Barry Boss and Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It,* 18 Ohio St. J. of Crim. Law 605, at 622 (2021)............................... 19

Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality Rates: New York, 1989-2003,* 103(3) Am. J. of Public Health 523, 523-28, (Mar. 2013) ................... 12

Jessie Diamond, *A Lifetime Lost: Aging in Prison for a Nonviolent Drug Offense,* 48-DEC Champion 49 (Nov. 2024) ................................................................ 12

Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998) ..................................................................... 18

ii

Prison Policy Initiative, *Incarceration Shortens Life Expectancy* (Jun. 26, 2017; updated Mar. 2021)..........................................................................................................11

Scott A. Budow, *A Mile Away, A World Apart: Life Expectancy Inequality in the United States*, 15 DePaul J. for Soc. Just. 1, 26–27 (2022) ........................................12

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing* Reform, (Nov. 2004)................................................................................................................17

United States Department of Justice National Institute of Justice, *5 things About Deterrence* (2016)..........................................................................................................16

United States Sentencing Commission, *Recidivism of Federal Offenders in 2010*, at 5 (Sept. 2021)......................................................................................................................15

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ............................16

**Defendant Ari Lauer's Sentencing Memorandum**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

## I.    INTRODUCTION

Ari Lauer comes before this Court having pled guilty to all the charges in the indictment. He has accepted responsibility for his criminal conduct and understands that his actions warrant a sentence of incarceration. In light of Mr. Lauer's lifelong history, prior to and after his time with DC Solar, of being a contributing, caring, and law-abiding person; the sentences of defendants with similar guidelines calculations; and the sentences of Mr. Lauer's co-conspirators most similarly situated him, counsel requests the Court impose a sentence of 78 months of custody and three years of supervised release.

## II.    THE PRESENTENCE REPORT

The Probation Office has calculated Mr. Lauer's applicable offense level to be 39 with a Criminal History Category I, resulting in an advisory sentencing range of 262 to 327 months. Dkt. 81, ¶¶ 60-83, 118 (Presentence Report, hereinafter "PSR"). The Probation Office has recommended a sentence of 210 months. *Id*. at pg. 37. The defense has objected to the Probation Office's sentencing guideline calculations and has submitted that the proper calculation of Mr. Lauer's guidelines results in an offense level of 35 and an advisory sentencing range of 168 to 210 months. *See* Dkt. No. 82 (defense formal objections to PSR). The defense has also objected to four of the special conditions of supervised release proposed by the Probation Office and requested modifications of the same. *Id*. at 28-30. The government responded to and opposed some the defense's objections to the Probation Office's guidelines calculations. Dkt. 83, 84, 85.

## III.    SENTENCING RECCOMENDATION

As discussed below, application of the 18 U.S.C. § 3553(a) factors – particularly the history and characteristics of Mr. Lauer and the need to avoid unwarranted sentencing disparities– justify a downward variance and a sentence of 78 months of imprisonment.

/ / /

1

**A.     The nature of the offense and Mr. Lauer's history and characteristics justify a 78-month sentence.**

        1.    <u>The nature of the offense</u>

Serving as DC Solar's attorney, Mr. Lauer drafted misleading documents – such as the Re-Rent Agreement and various sublease agreements – that were used to deceive investors. He knew that DC Solar did not have enough rental income to cover payments owed to investors, that DC Solar cycled money through its sister companies in a way that made it appear that third-party leasing of the mobile solar generators ("MSGs") generated substantial income, and that investors were not being told the truth about this arrangement. He helped the Carpoffs and others conceal this information from investors. Mr. Lauer fully accepts responsibility for his actions, admitting "[w]hat I did was wrong" and acknowledging what he should have done but failed to do:

> As an attorney with knowledge of these facts, I should have insisted that full disclosure of the sublease payment situation, including the payment arrangement between Solutions and Distribution, was required to not mislead or defraud the investors. Instead, I continued to assist the Carpoffs in concealing information from investors.

Declaration of Britt Evangelist in Support of Defense Sentencing Memorandum ("Evangelist Decl."), **<u>Ex. A</u>** at 1.

Mr. Lauer disputes none of his wrongdoing. However, Mr. Lauer's offense conduct, while undeniably serious, warrants a sentence significantly below the advisory guideline range.

First, there is no dispute that Mr. Lauer did not take on DC Solar as a client with the intent of defrauding its investors. For nearly a decade, Mr. Lauer had represented start-ups and other businesses in Northern California and had a track record of providing ethical and appropriate counsel, as seen from many of the letters submitted to the Court. *See* Section III-A-2, *infra*. When he became outside counsel for DC Solar, his intentions were no different.

Early in his work for DC Solar, Mr. Lauer learned that the company was struggling to sublease the MSGs. He also learned that investors were not being told of DC Solar's struggles. Mr. Carpoff, however, persuaded Mr. Lauer that the company would soon find a new market and

new customers for its MSGs, and that the company would eventually generate the sublease revenue promised to investors.  Mr. Lauer allowed himself to be persuaded by Mr. Carpoff's assurances in this regard and, in Mr. Lauer's words, led him to tell himself "lies about how DC Solar would turn it around, everything would work out in the end, and no one would get hurt." *Id*. at 2.  Over time, of course, Mr. Carpoff's promises of leasing success did not bear out.  But Mr. Lauer "clung to those beliefs," even though he "knew what I was doing was wrong."  *Id*.  In retrospect, he has also come to recognize that the fees and bonuses Mr. Carpoff paid him in connection with the tax credit deals made it easier for him to engage in this delusional thinking, although that of course is no justification for what he did.  *Id*.  Mr. Lauer recognizes that he should have spoken up, insisted on disclosure, and resigned if the client refused, regardless of how Mr. Carpoff portrayed future subleasing opportunities.  *Id*. at 1.  But Mr. Carpoff played to Mr. Lauer's desire to believe the business could and would eventually succeed, and, at a deeper level, played to his moral vulnerabilities – vulnerabilities that exist to a certain degree in many of us – of greed and a desire for professional success.  This created the space for Mr. Lauer, an otherwise honest and law-abiding man, to commit the greatest failure of character of his life.

Second, and as discussed further below in Section III-B-5, Mr. Carpoff hid from Mr. Lauer the most egregiously fraudulent conduct at the company.  Mr. Lauer knew of important aspects of the fraud in this case, as he has admitted, but he believed – because Mr. Carpoff and others told him so – that every MSG sold in the tax credit deals existed and had been certified as being in working order, even if not successfully subleased.  Mr. Lauer did not know that at some point Mr. Carpoff stopped manufacturing MSGs or of the elaborate deception employed by the Mr. Carpoff and others to hide their failure to manufacture the MSGs.[1]  Mr. Carpoff did not tell

---

[1] Mr. Lauer's objections to the PSR include a request to incorporate footnote 7 of the PSR into paragraph 34 of the PSR such that paragraph 34 states there is no evidence Mr. Lauer knew during the scheme that DC Solar failed to make all the MSGs it sold.  *See* Dkt. 82 at 2.  The government initially opposed this objection, dkt. 83, but has now amended its position to drop that opposition.  Dkt. 85.  However, the government now contends that DC Solar's failure to make all the MSGs sold was foreseeable to Mr. Lauer.  *Id*.  The government basis its position on

**Defendant Ari Lauer's Sentencing Memorandum**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

Mr. Lauer that he and others scraped Vehicle Identification Numbers (VINs) off MSGs and re-used the MSGs with new VINs to deceive investors into believing their MSGs had been built. He did not know that Mr. Carpoff and others surreptitiously staged MSGs in the field to make it appear to investors that their MSGs had been rented and deployed.  Mr. Carpoff did not tell Mr. Lauer how he and others buried GPS devices (unaffixed to MSGs) in the field to create false location reports for investors showing deployed MSGs.  The fact that the Carpoffs and others kept the most egregious forms of fraud from Mr. Lauer does not of course change the fact that Mr. Lauer engaged in wrongdoing of his own that was a key part of the conspiracy.  But it does appear that the Carpoffs, particularly Jeff Carpoff, understood that revealing the most blatantly fraudulent conduct to Mr. Lauer risked causing Mr. Lauer to quit the company or worse, and so Mr. Lauer was kept in the dark.

Finally, unlike other defendants in this case, Mr. Lauer did not try to escape responsibility for his crime by tampering with evidence and witnesses, lying to prosecutors and agents, or engaging in other coverup efforts.  After the FBI raided DC Solar, the Carpoffs and Joe Bayliss shredded evidence; Jeff Carpoff threatened Ryan Guidry, telling him "snitches get stiches," and he may have had a whistleblower threatened; the Carpoffs, Mr. Guidry, Rob Karmann, and Ron Roach purchased burner phones so they could continue to conspire without detection; Alan Hansen ██████████████████████████████████████████████████████████████ ██████████; and the Carpoffs tried to flee and to hide assets overseas.  PSR, ¶¶ 43-45; ██████ ████████████████████████████████████████████████████████████ Mr. Lauer

_____

a statement by a witness provided in 2025 in which the witness both says he "cannot recall the specifics of the conversation with" Mr. Lauer – a conversation that happened approximately 14 years prior – but that he's "sure" he told Mr. Lauer that DC Solar was selling MSGs it had not built.  Dkt. 84-7, Ex. 58.  This same witness never mentioned this supposed conversation to investigators during an interview years earlier in 2019.  Dkt. 84-6, Ex. 57.  As discussed in Mr. Lauer's formal objections to the final PSR, multiple witness statements and contemporaneous communications support the fact that Mr. Lauer did not know about the Carpoffs' failure to make the MSGs until after the execution of the search warrant.  *See* Dkt. 82 at 15-18.  One witness's questionable recollection to the contrary does not make Mr. Carpoff's decision to cease manufacturing MSGs foreseeable to Mr. Lauer.

did none of these things.  Instead, he continued his other, lawful business and did nothing to impede the investigation.

None of this excuses or justifies Mr. Lauer's conduct, but these factors do place Mr. Lauer in a different position than some of the other co-conspirators when assessing his relative culpability and the appropriate sentence.

           2.    <u>The history and characteristics of Mr. Lauer</u>

Mr. Lauer and his sister Mindy were raised by caring though emotionally distant parents in Los Angeles, California, in a practicing Jewish household.  PSR, ¶¶ 88-89.  Mr. Lauer was a strong student as a child, and that continued as he attended college and law school.  PSR, ¶¶ 108-109; Evangelist Decl., **Ex. B** at 13-14 (M. Bergines, childhood friend).  He excelled in music and his Jewish studies.  *Id*. at 38-39 (E. Fono, childhood friend).  While his childhood and young adulthood were relatively comfortable, they were not without significant challenges.  Mr. Lauer's father died when he was 17 years old.  PSR, ¶ 88.  The death of his father affected him profoundly and caused him to delay his departure for U.C. Berkeley where he had been accepted to college so that he could support his recently widowed mother.  Evangelist Decl., **Ex. B** at 5-6, 40 (letters from childhood friends M. Barnett and M Fono).

From an early age, Mr. Lauer exhibited the characteristics that would later come to define him as a man – empathy and caring for others, a devotion to his faith, integrity, and an admirable work ethic.  The multiple letters from Mr. Lauer's childhood friends attest to this.  *See*, *e.g*., *id*. at 8-9 (S. Barnett letter, describing Mr. Lauer as "steady, responsible and inclusive" and having "intelligence and drive").  After graduating from college, Mr. Lauer attended and graduated from law school.  PSR, ¶ 108.  Several years later, Mr. Lauer met his wife Sheryl (nee Zimmerman) in 1994.  They married three years later and relocated to Northern California where they raised three children and became an important part of their surrounding community, both in their temple and otherwise.  PSR, ¶¶ 91-92.  Mr. Lauer opened his own law office in 2001 and went on to build a successful solo practice, providing the sole source of income for the family while

his wife took primary responsibility for childcare.  *Id.* at ¶ 93.  Mr. Lauer's children are now out

of the house (*id.* at ¶ 92) and have embarked on promising careers of their own in New York.

Evangelist Decl., **Ex. B** at 62-65, 68-69 (letters from Lauer children).

As Mr. Lauer built a family, a career, and a community, he also built a singular

reputation.  The large number of letters submitted in connection with this memorandum are a

record of Mr. Lauer's kindness, generosity, and quiet integrity.  *See* Evangelist Decl., **Ex. B**

(letters of support).  As we note, Mr. Lauer had advantages that many do not, and the dozens of

letters submitted by those who know Mr. Lauer best show that he did not squander those

advantages.  Instead, Mr. Lauer shared those gifts of fortune with those around him in numerous

ways.

First, the letters describe Mr. Lauer as a devoted husband, father, brother, and family

member. While Mr. Lauer and his wife experienced relationship issues throughout their marriage

that eventually culminated in a recent divorce (PSR, ¶ 94), Mr. Lauer never faltered as a parent, a

supportive friend and partner to wife Sheryl, or a loving family member to his extended family.

Mr. Lauer's ex-wife Sheryl, who is understandably "very hurt by and angry at Ari" because of

how his actions "with DC Solar [have] torn my life apart and caused unspeakable heartache to

our children," describes Mr. Lauer as "a wonderful father to our children[.]"   Her letter details

Mr. Lauer's devotion to his children and to their extended family.  Evangelist Decl., **Ex. B** at 66-

67.  So many of the letters from Mr. Lauer's family and friends recount his devotion to his

children and his willingness to put them above all else, and the letter-writers share their

experiences and observations of Mr. Lauer's commitment to raising hardworking, upstanding

children.  *E.g.*, *id.* at 56 (S. Kadesh, writing "Ari has always taken great pride in being a devoted

father—never missing a sporting event, dance recital, or college parent weekend"); *id.* at 75-75

(M. Lauerlevin, describing Mr. Lauer's children as "always a priority"); *id.* at 79 (D. Matz

stating Mr. Lauer "has always prioritized his children, showing up for them with attentiveness

and love" and commenting that "[h]is parenting reflects the same conscientiousness and empathy

that he brings to his friendships").

All three of the Lauer children write glowingly of their childhood memories of their father. They comment on how he taught them to be selfless, kind, and generous, and they write that those qualities still define their father, despite the feelings of disappointment they now hold for him as well. *Id*. at 62-63, 64-65, 68-69. For example, in his letter, Mr. Lauer's son Ben recognizes how he has struggled "to reconcile the severity of [his father's] mistakes with the person I have understood him to be throughout my life" but also comments on how his father's " 'body of work' – years of being hard-working, compassionate, selfless, genuine, and caring - are emblematic of his true character[.]" *Id*. at 62. Mr. Lauer's oldest daughter, Julia Lauer, recounts how a journal Mr. Lauer kept during her and her siblings' childhood captures who her father is:

> My dad recently gave me a journal he has been keeping for the past twenty years detailing memories from my childhood. He wrote in the journal every few months with the intention of one day giving it to me and my siblings. It contains stories of our everyday lives: funny things I said on the way to school, his pride in my academic milestones, memories of family traditions, and everything else in between. Reading it, I was overwhelmed by the depth and consistency of his love. That journal reflects exactly who he is: thoughtful, intentional, and deeply devoted to his family.

*Id*. at 64-65.

The community letters, written by people who are aware of Mr. Lauer's offense, are filled with love for Mr. Lauer. They describe how, in all aspects of his life, Mr. Lauer focuses on the needs of others, not himself, and how generous he has been with his time, compassion, legal advice, and attention. For example, Stacy Kadish, a friend of 20 years, explains that Mr. Lauer "gives freely of his time, resources, and heart—whether through community involvement, charitable contributions, or simply being the person others know they can rely on." *Id*. at 55-56. She recalls how Mr. Lauer "showed a level of support, empathy, and constancy" when her husband was ill "that I will never forget," and that he did the same years later when she battled cancer. *Id*. Ms. Kadish concludes, "The world is unquestionably a better place with Ari in it." *Id*.

Many other letter writers share Ms. Kadesh's assessment of Mr. Lauer and attest to his generosity and decency as a friend and community member.  *E.g.*, *id*. at 6 (M. Barnett, friend of 50 years, recalling how Mr. Lauer "generously gave me his time, expertise, and legal guidance" and helped save his family home); *id*. at 45 (D. Germain, friend of 40 years, explaining how even as a young man in his 20s, Mr. Lauer "consistently put the needs of others before his own"); *id*. at 78 (D. Matz, friend of 25 years, recalling Mr. Lauer's support through his wife's battle with breast cancer and his son's traumatic brain injury); *id*. at 102-103 (W. Roth, friend of 39 years, describing the support provided by Mr. Lauer through both of his parents' passing); *id*. at 121 (Mr. Lauer's sister-in-law reflecting on the care and he provided to her aging parents); id. at 118 (Mr. Lauer's brother-in-law recalling the same); *id*. at 113 (M. Thompson, friend and client of 20 years stating Mr. Lauer "would often support [his] charitable events by providing his time, whether it was building new playgrounds for physically and mentally challenged children, building playhouses with Habitat for Humanity or building bikes with the Sharks Foundation, just to name a few").

The letters from members and the leadership of Mr. Lauer's temple speak to his deep involvement with and generosity to that community.  Rabbi Judy Shanks, who has known Mr. Lauer and his family for over two decades, describes how Mr. Lauer has consistently volunteered in the temple band and donated "his legal counsel to synagogue leaders and our Executive Director in a variety of issues pertaining to both personnel and safety needs in a time of rising anti-Semitism in our country."  *Id*. at 104-105.  A dozen other letters submitted by temple leaders and other community members speak to Mr. Lauer's importance to that community.  *E.g.*, *id*. at 10-11 (J. Bell, former temple president recalling Mr. Lauer's contributions to the temple); *id*. at 57-58 (D. Kirsch, temple Executive Director, stating Mr. Lauer's "long-standing service [to the temple] reflects not only his expertise as an attorney but also his values as a community-minded individual who contributes meaningfully and quietly, without seeking recognition"); *id*. at 60-61 (Cantor Korn, describing Mr. Lauer's and his family's important role in the temple community);

*see also id*. at 84-85 (Rabbi Miller letter); *id*. at 12, 35-36, 49, 95-96, 100, and 108-109 (letters from members of Mr. Lauer's temple).

Finally, while Mr. Lauer's professional life accomplishments will forever be shadowed by his conduct with DC Solar, the letters submitted to the Court include over two dozen from his clients, all of whom attest to the thoughtful and ethical counsel he has provided to them, sometimes over the course of decades.  Sean Finn, a client of 20 years and an owner of many companies, writes to the Court about how Mr. Lauer's legal advice saw him through the "COVID years" and kept him on the correct side of the PPP loan process:

> We got one of the initial PPP loans with my CPA, Bank and Ari's help . . . I wanted to apply for another round. My CPA, my bank both told me I qualified. It was Ari that told me not to do it. He said that it was too much of a gray area and in his opinion, I didn't need it and it would be wrong to apply for it. It was not what I wanted to hear. After some thought I took his advice and did not apply, it was the right move.

*Id*. at 37.

Mr. Finn is not alone in his observation that Mr. Lauer practiced with integrity and professionalism and that he guided his clients to follow the law even when they may have wanted a more expedient solution.  *See id*. at 2 (J. Allen, client of 20 years, recalling "There were occasions when I felt the law was too cumbersome and I asked Ari for other options He politely said there were no other options and 'this is the only way to handle this properly.'"); *id*. at 24-25 (A. Council, client of 18 years, recalling that "Whenever we discussed a legal avenue that could be available, Ari did not stop there, but he always brought in an ethical factor to the issue at hand. He always looked at the issue of how things affected the cross party involved and would raise questions on a moral ground above a legal ground and would help to steer me into making not only a smart legal decision but also one that was morally elevated."); *id*. at 80-81 (R. Melnicoff, client of 15 years, stating "Ari helped me settle these disputes without litigation and gave me advice about how and why to do so even though some of that advice was not easy for

9

me to hear.").[2]

Many of the letters from Mr. Lauer's clients describe a relationship that started as purely professional but became one of close friendship. Scott Ehrlich writes how in "2004 Ari served as my company's attorney, and in getting to know him our relationship evolved into a wonderful friendship with the common denominator being the love of our family." *Id.* at 33-34; *see also id.* at 91-92 (letter from Barry and Lori Nudelman, clients of 25 years, explaining how "over the years our relationship with Ari became more of a friendship" and why the entrusted him to be executor of their estate); *id.* at 110-111 (L. St. John, client of over 15 years, stating Mr. Lauer "has been a great attorney for me, but more than that, he is a good man, one that I have trusted, and he has always done right by me, even when it wasn't about work, when it really mattered."). And many of the letters describe how Mr. Lauer's friends and colleagues often turned to him for legal advice and were never disappointed in the results. *See id.* at 26-27 (D. Douglas, friend of 25 years, describing how Mr. Lauer also served as attorney for his firm for over 20 years); *id.* 52-53 (R. Kadesh, a friend of 25 years, writes "Ari has been an exceptional attorney and advisor— providing thoughtful, ethical, and balanced legal guidance."); *id.* at 86-87 (B. Napper, friend of 20 years, explaining how he retained Mr. Lauer to represent him in business transactions).

The letters from Mr. Lauer's supporters demonstrate and describe his lifelong history of kindness, good deeds, and integrity. While Mr. Lauer's good acts in his life do excuse the crimes he committed and for which he must be punished, they should be considered to set the offense conduct in context, revealing it to be aberrant, and they should weigh in favor of a more lenient sentence. *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006)

---

[2] Other client letters can be found at Evangelist Decl., **Ex. B** at 21-22 (M. Buzzard, client of over 17 years); *id.* at 23 (S. Conley, client of 25 years); *id.* at 32 (J. Dudum, client of 8 years); *id.* at 50 (S. Hagerstand, client of 20 years); *id.* at 59 (J Kittredge, client of 8 years); *id.* at 82-83 (A. Miley, client of 20 years); *id.* at 93-94 (P Nurney, client of 8 years); *id.* at 99 (J. Porter, client of 15 years); *id.* at 116 (M Wittmayer, client of 5 years); *id.* at 17-18 (W. Budenbender, client of 20 years); *id.* at 51-52 (J. Hom, client of 10 years); *id.* at 101 (letter from J. Robinson, client of over 10 years).

("[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").[3]

**B.    The goals of sentencing can be achieved by a 78-month sentence**

   1.    <u>A 78-month sentence will reflect the seriousness of the offense, promote respect for the law, and provide just punishment</u>

Seventy-eight months in federal prison is by any measure a very serious punishment. But prison is only one part of the punishment Mr. Lauer has and will continue to experience. The indictment and conviction have destroyed his professional reputation, ended his legal career[4], depleted his finances, and accelerated the dissolution of his marriage. Under the defense's proposed sentence, Mr. Lauer will be released from prison well past retirement age with little money and no ability to practice his chosen profession, and with financial obligations to the victims in this case that he will work the rest of his life to pay down. There should be little doubt that the sentence proposed by the defense provides just punishment for this serious offense and will promote respect for the law.

The Court should also consider Mr. Lauer's health history and age when determining a term of imprisonment sufficient but not greater than necessary to achieve the goals of sentencing. Mr. Lauer is 61 years old and a cancer survivor who, due to ongoing abnormal testing results, still requires frequent screening to detect a potential recurrence. PSR, ¶ 100. Studies show that incarceration drastically shortens a person's life expectancy. *See* Prison Policy Initiative, *Incarceration Shortens Life Expectancy* (Jun. 26, 2017; updated Mar. 2021) (discussing studies on the inverse correlation between time in jail and life expectancy)[5]; *see also* Scott A. Budow, *A*

---

[3] The defense requests that the Court allow no more than three of Mr. Lauer's family members and friends to speak about him at sentencing.

[4] Mr. Lauer reported his guilty plea to the California Bar Association as required. His bar license has been suspended.

[5] Available at: https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/

---

11

*Mile Away, A World Apart: Life Expectancy Inequality in the United States*, 15 DePaul J. for Soc. Just. 1, 26–27 (2022) (accord); Jessie Diamond, *A Lifetime Lost: Aging in Prison for a Nonviolent Drug Offense*, 48-DEC Champion 49 (Nov. 2024) (accord).  One study "identified a linear relationship between incarceration and life expectancy: for each year lived behind bars, a person can expect to lose two years off their life expectancy." *Incarceration Shortens Life Expectancy, supra* (citing Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality Rates: New York, 1989-2003*, 103(3) Am. J. of Public Health 523, 523-28, (Mar. 2013)).  The sentence recommended by the defense will keep Mr. Lauer in prison until approximately age 68.  Consistent with his age, Mr. Lauer will likely face additional health challenges over the next decade, and his health can be expected to decline more rapidly during incarceration than a younger man's might.  With average male life expectancy in the United States at 76 years,[6] the defense's recommendation would have Mr. Lauer incarcerated for just under half of the expected remaining lifespan of someone not in custody.  While the amount of life lost to prison varies by study, there is little doubt incarceration leads to a shorter life.  A lengthier sentence, such as the one recommended by the Probation Office, may mean Mr. Lauer does not live to see his release.  The 294-month sentence recommended by the government will unquestionably result in Mr. Lauer dying in prison.  Mr. Lauer's crimes do not warrant what could effectively be a life sentence.

Finally, the sentence the defense is requesting would likely result in Mr. Lauer serving his time in a federal prison camp ("FPC").  The sentence recommended by the Probation Office, by contrast, would result in Mr. Lauer serving time at a federal correctional institution ("FCI") until less than 10 years remains on his sentence.  Evangelist Decl., ¶ 4(a),(b).  The experience of incarceration at an FPC differs considerably from the experience at an FCI.  An FCI employs perimeter security and other forms of heightened security, such as the physical segregation of units, frequent housing searches, and mass body checks that are far less common at FPCs.  *Id.* at

---

[6] Available at: https://www.cdc.gov/nchs/fastats/life-expectancy.htm.

¶ 4(c),(d).  FCIs are also generally much larger and suffer from far more crowded conditions than FPCs.  For instance, the closest low-security FCI to the San Francisco-area is FCI Lompoc where they have two low-security FCIs. One of those FCIs, FCI II, has a current population of 1,957 and is 94% over its rated capacity of 1,009.  In contrast, the two FPCs located at Lompoc currently operate under capacity, with one housing from 122 (capacity of 160) and the other 198 (capacity of 276 inmates).  *Id*. at ¶ 4(e)-(g).  Overcrowding at FCIs results in cubicles being quadruple bunked, and in some facilities, inmates are placed on mattresses on the floor in "overflow units," as well as longer lines to use the telephone, to see a member of the inmate's unit team, for medications and checkups, and to use the library, toilets, sinks, and showers.  *Id*. at ¶ 4(h). Finally, the population of inmates at an FCI differs from that at an FPC, with FPCs generally housing first-time offenders and others who have committed nonviolent crimes, have minor or no criminal history, and pose no public safety or flight risk; while FCIs house a population who committed a wider range of criminal offenses, including violent offenses.  Inmates at FPCs also generally behave well out of fear they will end up in a higher security institution (infractions can penalize a camp inmate with a transfer to a low-security facility), creating a safer environment for all inmates housed at FPCs.  *Id*. at ¶ 4(i),(j).  Imposing just punishment in this case means a sentence that allows Mr. Lauer to serve his time at an FPC.

2.   A 78-month sentence will provide adequate deterrence and protect the public from further crimes

Regarding specific deterrence, Mr. Lauer has been deterred and does not present a danger to the public. While that is true of many white-collar defendants, it is particularly true of Mr. Lauer.  For decades preceding the years of his offense conduct, Mr. Lauer lived an honest and law-abiding life, and that has resumed in the seven years since he stopped working for DC Solar.  Mr. Lauer has been thoroughly deterred from committing another offense before serving a single day of his sentence.  He feels remorse for the way his decisions hurt both the direct and indirect victims of his crimes.  Evangelist Decl., **Ex. A** at 3 ("I am also conscious of the fact that there

13

were individuals involved who represented the investors, some of whom may have lost their jobs over these transactions or suffered other adverse employment actions. I sincerely apologize to the victims of my crimes.").  Mr. Lauer has also started the hard work of understanding the decisions he made that led him to commit this crime.  While he readily admits that greed and other disreputable motivations led to his crimes, he has much work to do to comprehend fully why he succumbed to those impulses given the greater context of his life:

> I feel a great deal of remorse, shame, guilt and embarrassment about my choices. This is not who I am. I believe honesty and integrity are two of the most important characteristics a person can possess, yet I let down the investors, my family, my friends, and my profession by not being honest. I have never done anything like this with any other client or in any other aspect of my life. I would like to be able to explain to the Court, my family, the prosecutors, and the victims, why I did this. I don't have a full answer to that question yet. I know part of it was greed. DC Solar paid me well every time we closed a deal, and Jeff Carpoff showered me with bonuses. I also think part of it was a feeling of importance that I enjoyed every time we closed another transaction with another big company. I also told myself lies about how DC Solar would turn it around, everything would work out in the end, and no one would get hurt.

*Id*. at 2-3

Those who know Mr. Lauer best have witnessed him engage deeply with the process of accepting responsibility for his crimes, and in their letters to the Court they express confidence that Mr. Lauer will not re-offend as a result.  Former federal prosecutor Sharon Bunzel has spoken with Mr. Lauer about his offense and explains why she has "been so impressed by Ari 's profound remorse and honest acceptance of responsibility for his role in this matter":

> As both a prosecutor and criminal defense attorney, I have seen countless defendants begrudgingly resign themselves to guilty pleas and profess to have accepted responsibility for their actions, saying all the required words, but not truly believing it. Ari is different. His contrition and remorse run very deep, and rather than downplay his role or responsibility, even in the privacy of one-on-one conversations, he has been brutally and proactively honest, and has reflected on the harm and pain that he has caused. He seems to have aged 10 years in the past few, and is deeply shamed and sad about what he has done.

Evangelist Decl., **Ex. B** at 19-20.

14

Likewise, attorney David Gerson writes in his letter of a two-hour conversation he had with Mr. Lauer about his offense. Mr. Gerson recounts how Mr. Lauer "answered all my questions in detail, and I went away with a better understanding on how such a kind, caring and thoughtful person could suffer such a fall from grace." Mr. Gerson left that conversation understanding that Mr. Lauer was "taking responsibility" for his actions, was worthy of his continued support, and the offense conduct "is not representative of who Ari is and will be in the future." *Id*. at 47-48. Rabbi Shanks also recounts how "Ari has expressed to me his remorse and shame for what he did, and how he intends to work on himself to understand why he strayed far from his ideals and true character in this case." *Id*. at 104-105. Rabbi Shanks, believes Mr. Lauer "will do that hard work" to understand the root cause of his criminal conduct, and "because I know Ari to have been a good man in the other aspects of his life, I believe he will never commit another crime, nor even come close to doing so again." *Id*.

To the extent achieving deterrence requires custody time, the prison term recommended by the defense will be particularly difficult for Mr. Lauer. He has no criminal history whatsoever and has never spent a day in custody. Even a short period of confinement would achieve deterrence, although the defense proposes a lengthy one. *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) ("a prison term would mean more to [a defendant who has never been imprisoned] than to a defendant who previously had been imprisoned. Consideration of this factor is consistent with section 3553's directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence.'"). Finally, statistically speaking, there is a very low likelihood of re-offense given Mr. Lauer's age and his lack of any prior criminal history. United States Sentencing Commission, *Recidivism of Federal Offenders in 2010*, at 5 (Sept. 2021) (9.4% re-arrest rate for offenders age 60 and older in CHC I).[7] Simply put, Mr. Lauer poses no

---

[7] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.

**Defendant Ari Lauer's Sentencing Memorandum**
*United States v. Lauer*, No. 2:23-cr-0261 DAD

risk of re-offense.

In terms of general deterrence, a 78-month sentence, particularly in combination with the collateral consequences of conviction that Mr. Lauer will experience for the rest of his life, will be a more than adequate warning to others of why crimes such as Mr. Lauer's do not pay. Any would-be criminal would be dissuaded by the punishment that we propose Mr. Lauer receive along with the collateral harms of the destruction of his career, his reputation, his finances, his marriage – effectively everything he had spent a lifetime building. In addition, as the Department of Justice recognizes, "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime." United States Department of Justice National Institute of Justice, *5 things About Deterrence* (2016), at 1.[8] In fact, research on deterrence shows that while certainty of punishment has a deterrent effect, "[i]ncreasing the severity of punishment does little to deter crimes . . . partly because criminals know little about the sanctions for specific crimes." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity . . . there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

        3.     <u>A sentence of 78 months would take into account the lack of empirical evidence supporting the fraud guidelines</u>

A correctly calculated guidelines range is, of course, one of the factors the Court must consider in reaching its sentencing determination. However, when, as here, the guideline section that is the principal driver of the sentencing range is one that is not based in empirical data or national sentencing experience, it should be given proportionally little weight. See *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007) (where a Sentencing guideline is not the product of the Sentencing Commission exercising its 'institutional role' of promulgating guidelines based

---

[8] Available at: https://www.ojp.gov/pdffiles1/nij/247350.pdf

on empirical data and the national experience, sentencing court may conclude that the guideline range is greater than necessary to achieve the purposes of sentencing); *see also Spears v. United States*, 555 U.S. 261, 264 (2009) (when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case"). The fraud guideline presents a prime example of a guideline lacking in empirical support.

The original fraud guidelines (formerly § 2F1.1), adopted by the Sentencing Commission in 1987 following the Sentencing Reform Act of 1984, were the product of the kind of empirical analysis that warrants deference by the courts. The Commission found that, "[a] large portion of fraud, embezzlement, and tax evasion offenders received simple probation." U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing* Reform, at 55-56 (Nov. 2004) [hereinafter *Fifteen Year Report*].[9] Accordingly, one of the key purposes of the 1987 fraud guidelines was to ensure that white collar offenders faced "short but definite period[s] of confinement." *Id*.

In contrast, the dramatic increase in the fraud loss table in the guidelines is not the product of empirical analysis. *See* U.S.S.G., App. C., Amend. 154 (Nov. 1, 1989) (1989 amendment increasing the loss enhancements based not on empirical research, but on the Commission's desire to "conform the theft and fraud loss tables to the tax evasion table . . . [and] to increase the offense levels for offenses with larger losses to provide additional deterrence[.]");[10] and U.S.S.G., App. C., Amend. 617 (Nov. 2001) (changing tiered loss brackets

---

[9] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

[10] Available at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1989/manual-pdf/Appendix_C.pdf

from increasing enhancements by one level per tier to two levels per tier; increases not based on research but in response to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the guideline] under-punish[es] individuals involved in moderate and high loss amounts[.]").[11]  Objective social science research refutes the Commission's unsupported position that increasing the length of incarceration for white-collar offenders promotes the goals of sentencing.  *See* Section III-C-3, *supra*.

Rather than emerging from data or sentencing experience, the fraud guideline has evolved primarily through politically driven directives that ratchet up sentences without meaningful calibration to culpability. *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J. concurring) (noting that recent increases to the fraud guideline were adopted "without the benefit of empirical study," rendering the guideline "fundamentally flawed").  As a result, courts have frequently discounted the advisory range resulting from an application of the fraud guidelines.  *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014) (criticizing sentences tied to the guidelines' reliance on a "single factor—loss or gain" as "irrational on their face," and imposing a 24-month sentence where the guideline range was 78–97 months).  The disconnect becomes particularly acute where the calculated loss bears little —or, as here, no—relation to a defendant's personal gain.  *United States v. Lenagh*, No. 8:07-CR-346, 2009 WL 296999, at *6 (D. Neb. Feb. 6, 2009) (holding that applying the full $1.4 million loss amount to a defendant who received only $95,000 "would exaggerate her culpability and would not be an accurate measure of her blameworthiness"); *see*

---

[11] *See, also Fifteen Year Report* at 56 (absence of empirical research establishing the need for the amendments led one former Commissioner to warn that the SRA's promise of policy development through expert research was being supplanted by symbolic "signal sending" by Congress); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)) ("[Be]cause of their arithmetic approach and also in an effort to appear 'objective,' [the guidelines] tend to place great weight on putatively measurable quantities, such [as] . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.").

*also United States v. Watt*, 707 F. Supp. 2d 149, 155 (D. Mass 2010) (observing that while the "Guideline drafters believed loss was an appropriate proxy because it reflected both 'harm to the victim' and 'gain to the defendant,'" that is not the case in many situations).

Because the offense enhancements associated with the loss amount are not grounded in empirical data, under *Kimbrough* a court may reject the suggested range if it finds the range yields a sentence greater than necessary to achieve sentencing goals in a particular case. That is certainly the case with the application of the current fraud guideline to Mr. Lauer's situation. The Court should thus afford the advisory range under the current fraud guideline comparatively little weight in its sentencing determination. The defense's recommended sentence of 78 months mitigates the enormous increases in the fraud guideline that are untethered to empirical data and reflects an appropriate punishment for the offense conduct.

        4.    <u>A 78-month sentence is necessary to avoid unwarranted sentencing disparities</u>

The sentencing practices of courts nationwide confirm the inflated nature of the sentencing ranges resulting from the fraud guideline. Available sentencing data shows that courts across the country impose below-guidelines sentences for defendants sentenced under § 2B1.1. It has been estimated that from 2015 to 2019, the median sentence in a case using § 2B1.1 was 45 to 50 percent below the low end of the advisory guidelines range. *See* Barry Boss and Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. of Crim. Law 605, at 622 (2021).[12] The defense calculates Mr. Lauer's total Offense Level to be 35, and his lack of prior convictions places him in Criminal History Category I, resulting in a sentencing range of 168 to 210 months. However, the Judiciary Sentencing Information (JSIN) data shows a median sentence of 99 months and an average sentence of 102 months for defendants with a total Offense Level of 35 and Criminal History Category I (excluding defendants who received a § 5K1.1 departure). Evangelist Decl., **<u>Ex. C</u>** at 1. Even at the total

---

[12] Available at: https://moritzlaw.osu.edu/sites/default/files/2021-10/how%20the%20economic.pdf

Offense Level of 39 as calculated by the Probation Office, the JSIN data shows a median sentence of 120 months and an average sentence of 145 months.  Evangelist Decl., **Ex. D** at 1. Imposing even the below-guidelines term recommended by the Probation Office would thus result in Mr. Lauer receiving a sentence many years longer than the heartland of sentences nationally.  A sentence significantly below that recommended by the Probation Office should be imposed to avoid this disparity.

Imposing a sentence well below the Probation Office's or the government's anticipated recommendation would also align Mr. Lauer's sentence with that of his comparable co-conspirators.

The Court imposed extremely lengthy sentences on Jeff Carpoff (30 years) and Paulette Carpoff (11.25 years, after accounting for cooperation).  The Carpoffs' roles in the offense, however, render them differently situated than Mr. Lauer at a fundamental level.  The Carpoffs founded DC Solar, ran it as their own tightly controlled fiefdom, and perpetrated and controlled all aspects of the fraud committed.  This includes not only the deceptive and misleading representations and documents made and sent to investors about the sublease revenue and rental rates for the MSGs that Mr. Lauer participated in, but also a host of other fraud he did not, including bribes to various individuals in exchange for their signing sublease agreements and other documents, VIN scraping, GPS burying, and elaborate staging of MSGs in the field – all to conceal the fact (unbeknownst to Mr. Lauer) that DC Solar failed to make all the MSGs it sold and to mislead investors into thinking their MSGs had been deployed.  *See United States v. J. Carpoff*, No. 20-cr-00017, Dkt. 10 at 18-19 (plea agreement); *United States v. P. Carpoff*, No. No. 20-cr-00018, Dkt. 10 at 19-20 (plea agreement); PSR, ¶ 35.

The Carpoffs also bilked the company of tens of millions of dollars to fuel their lavish lifestyles.  The expert for the DC Solar Bankruptcy Trustee concluded that DC Solar directly paid the Carpoffs $85.8 million, paid another $22 million to the IRS on behalf of the Carpoffs, spent $20 million on private jets for the Carpoffs, and paid another $40 million to Carpoff-

controlled entities.  *See* Dkt. 82-11, ¶¶ 74-75, Table 5 (report from bankruptcy trustee expert filed in support of PSR objections).  The Carpoffs used the proceeds of the fraud to purchase and invest in more than 150 luxury and collector vehicles, luxury real estate in Lake Tahoe, Las Vegas, the Caribbean, Mexico, and elsewhere, a suite at a professional football stadium, expensive jewelry, and a minor-league baseball team, among other extravagances.  *See United States v. Carpoff*, No. 20-cr-17, Dkt. 10 at 6-7, 19, 24 (plea agreement); PSR, ¶¶ 36-39.  In addition, in response to the FBI raid the Carpoffs doubled down on their criminality and engaged in obstruction by instructing Mr. Guidry to fetch their passports (which had already been seized by the FBI) so that they could flee the country, attempting to intimidate Mr. Guidry by telling him "snitches get stiches," instructing Mr. Bayliss to shred evidence, encouraging their co-conspirators to get burner phones so that they could communicate without detection by law enforcement, and transferring $5 million directly from a investment fund's account to an account controlled by the Carpoffs' asset protection attorney.  PSR, ¶¶ 40, 43-45.[13]

While Mr. Lauer engaged in certain important aspects of DC Solar's fraud and profited from his offense, his level of involvement in the fraud, the degree to which he profited from it, and his behavior after law enforcement appeared on the scene cannot in any way be compared to the Carpoffs'.  A sentence of 78 months will not result in unwarranted sentencing disparity between Mr. Lauer and the Carpoffs because significantly different sentences are entirely warranted.

However, a sentence of 78 months would bring Mr. Lauer's sentence in line with those received by the non-Carpoff co-conspirators.  The other co-conspirators that have been sentenced in this matter are as follows: Mr. Karmann received a 72-month sentence, Mr. Guidry a 78-

---

[13] *See also* Dpt. Of Justice press release regarding indictment of Carpoffs' attorney.  Available at: https://www.justice.gov/usao-sc/pr/hilton-head-lawyer-sentenced-knowingly-transferring-3m-prevent-lawful-seizure-funds.

month sentence,[14] and Mr. Hansen a 96-month sentence.  *See United States v. Karmann*, No. 19-cr-00222, Dkt. 54 (judgment); *United States v. Guidry*, No. 20-cr-00003, Dkt. 69 (judgment); *United States v. Hansen*, No. 20-cr-00016, Dkt. 57 (judgment).

Mr. Lauer's role in the fraud more closely resembles that of some of these other sentenced defendants, particularly Rob Karmann, DC Solar's Chief Financial Officer and a licensed CPA.  Mr. Karmann, like Mr. Lauer, knew of the lack of sublease revenue, the transfers of funds between companies to create the appearance of revenue, and misrepresentations to investors and others.  Mr. Karmann, like Mr. Lauer, created false or misleading documents that were provided to investors and others.  Mr. Karmann assisted in the creation of fake MSG usage and location reports and false revenue reports that were provided to investors (activity in which Mr. Lauer was not involved), while Mr. Lauer created the misleading Re-Rent Agreement and deceptive sublease documents (activity in which Mr. Karmann was not involved).  *United States v. Karmann*, No. 19-cr-00222, Dkt. 15, at A-7 to A-10 (plea agreement describing Karmann's involvement in the scheme).

In terms of profiting from the offense, Mr. Lauer profited in a manner similar to Mr. Guidry and Mr. Hansen.  Like Mr. Guidry and Mr. Hansen, Mr. Lauer benefitted from the scheme through regular payments – attorney's fees in Mr. Lauer's case and hourly wages in Mr. Guidry's and Mr. Hansen's case – as well as large lump sum payments – approximately $1 million in bribes and rewards to both Mr. Guidry and Mr. Hansen, and approximately $1.275 million in bonuses to Mr. Lauer.  *United States v. Ryan Guidry*, No. 20-cr-3, Dkt. 13 at A-6 (plea agreement); *United States v. Hansen*, No. 20-cr-00016, Dkt. 16 at A-6 to A-8 (plea agreement). Mr. Hansen, unlike Mr. Karmann, Mr. Guidry and Mr. Lauer, ███████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████ Mr. Hansen's deception likely resulted in him receiving a lengthier

---

[14] Mr. Guidry's sentence was later reduced to 65 months based on the newly created Zero Point Offender reduction.  *See United States v. Guidry*, 20-cr-0003, Dkt. 113.

sentence than Mr. Guidry and Mr. Karmann, who otherwise had fairly similar roles in the offense; that conduct also renders Mr. Hansen not fully similarly situated to Mr. Lauer.

The defense recognizes that the government recommended departures for all these defendants under § 5K1.1 and that, unlike Mr. Lauer, they pled guilty at the outset of the proceedings in their case. These two facts, however, do not render the sentences received by these defendants incomparable.

First, while the government will not be filing a § 5K1.1 motion on behalf of Mr. Lauer, Mr. Lauer has made efforts to cooperate that approximate those made by the other defendants, none of whom actually testified as part of their cooperation. Mr. Lauer met with and cooperated with counsel for the DC Solar Bankruptcy Trustee and has committed to doing so again in the future. Evangelist Decl., **Ex. E** (letter from counsel for bankruptcy trustee). Mr. Lauer also offered to cooperate with the government to assist in the investigation and prosecution of others, and undersigned counsel made two attorney proffers on behalf of Mr. Lauer to the prosecutors and agent. While the government declined to take Mr. Lauer up on his offer to cooperate, the defense understands that was not because of concerns about Mr. Lauer's veracity. Evangelist Decl., ¶ 8.

23

█████████████████████████████.[15]

      Finally, the defense recognizes that Mr. Lauer did not plead as early as these other defendants and, perhaps as a result, was not able to consummate his cooperation.  For that reason, the defense recommends that Mr. Lauer receive a lengthier sentence than his co-conspirator Mr. Karmann, who is otherwise similarly situated.  But the "penalty" for that later entry of plea should be a matter of months, not a matter of many years.

      In sum, the Court should impose a significantly below-guidelines sentence to avoid unwarranted sentencing disparity with sentences imposed on defendants across the nation, as well as to align Mr. Lauer's sentence with those of his most similarly situated co-conspirators.  The defense submits a sentence of 78 months best achieves this goal.

/ / /

/ / /

---

[15] The Probation Office did not view the sentences received by the non-Carpoff co-conspirators in this case as comparable because they "entered into plea agreements that involved different offenses and penalties." Dkt. 81 at 69.  The Probation Office is wrong.  These other defendants negotiated plea agreements that involved guilty pleas to offenses with statutory maximum sentences that capped the defendants' total exposure and provided additional sentencing protection by eliminating the chance that the Court could impose a sentence within the guidelines range. Those caps do not reflect a difference in culpability and do not appear to have driven the Court's sentences.  For example, in Mr. Karmann's case the parties stipulated to a guidelines range of either 262 to 327 months or 324 to 405 months.  *United States v. Karmann*, No. 19-cr-00222, Dkt. 15, 11-14.  Mr. Karmann then pled to charges that carried a combined statutory maximum of 180 months.  *Id*. at 9-10.  But the Court imposed sentences on Mr. Karmann and others that were below both the guidelines *and* the statutory maxima, suggesting that the Court found these cases did not warrant either.  What matters is not the charges the defendants pled to or the maximum sentences they carried, but instead the sentences these defendants received for comparable conduct after consideration of all of the sentencing factors.  As such, the sentences imposed on Mr. Lauer's non-Carpoff co-conspirators are all valid comparisons.

24

1
2
3
4

**IV.    CONCLUSION**

5
6
7

      For the foregoing reasons, the defense respectfully requests that this Court sentence Mr. Lauer to 78 months imprisonment to be followed by three years of supervised release.

8
9

Dated: March 4, 2026              Respectfully submitted,

10
11

                  */s/ Edward W. Swanson*

12
13

                  EDWARD W. SWANSON
                  BRITT EVANGELIST
                  SWANSON & McNAMARA LLP
                  Counsel for ARI LAUER

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendant Ari Lauer's Sentencing Memorandum**
*United States v. Lauer*, No. 2:23-cr-0261 DAD